**In re NICE SYSTEMS SECURITIES LITIGATION.**

**CIV.A. No. 99–1693AJL.**

United States District Court,
D. New Jersey.

June 10, 1999.

Steven G. Schulman, Richard H. Weiss, Russell J. Gunyan, Milberg Weiss Bershad Hynes & Lerach, New York City, Proposed Lead Counsel.

Peter S. Pearlman, Cohn Lifland Pearlman Herman & Knopf, Saddle Brook, NJ, Proposed Liaison Counsel.

Samuel Kadet, Skadden, Arps, Slate, Meagher & Flom, Newark, NJ, Counsel for Defendants.

## OPINION

LECHNER, District Judge.

This is an action for securities fraud brought on behalf of purchasers of American Depository Shares ("Nice ADSs") of Nice Systems, Ltd. ("Nice Systems"), seeking damages for violations of Section 10(b) and Section 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, 15 U.S.C. §§ 78t(a) and 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, from Nice Systems, David Arzi, Benjamin Levin and Mordechai Golan (the "Defendants"). Jurisdiction is alleged pursuant to 28 U.S.C. § 1331.

Currently pending is a motion for the appointment of lead plaintiffs (the "Lead Plaintiffs Motion") and approval of the selection of liaison counsel and lead counsel (the "Lead Counsel Motion"), pursuant to § 21D(a)(3) of the Exchange Act, as amended, 15 U.S.C. § 78u–4(a)(3). The Lead Plaintiffs and Lead Counsel Motions were filed on behalf of Marvin Frank, Jeremy Eisenberg, Brian Glogower, Gregory Guinn, Jain Pradeep, Daniel Laser, Rubin Jeffrey and Mark R. and Jane Smith (the "Proposed Lead Plaintiffs").[1] For the reasons set forth below, the Lead Plaintiff Motion is granted in part and denied in part; the Lead Counsel Motion is granted in part and denied in part.

### Background

#### A. Procedural History

The instant action is a consolidation of *Marvin Frank v. Nice Systems, Ltd., David*

---

1. In support of the Lead Plaintiffs and Lead Counsel Motions, the Proposed Lead Plaintiffs submitted:

 1) Memorandum of Law in Support of Proposed Nice Systems Lead Plaintiffs' Motion for Appointment as Lead Plaintiffs and for Approval of Proposed Nice Systems Lead Plaintiffs' Selection of Liaison Counsel and Lead Counsel (the "Moving Brief"); and

 2) Affidavit of Richard H. Weiss in Support of the Lead Plaintiffs and Lead Counsel Motions (the "Weiss Aff.") with attached exhibits.

 Defendants, by letter, dated 26 May 1999 took no position with respect to the pending Lead Plaintiffs and Lead Counsel Motions.

*Arzi, Benjamin Levin and Mordechai Go-lan,* Civil Action No. 99–1307 (AJL) (the *"Frank* Action") and *Janes Bell v. Nice Systems, Ltd., David Arzi, Benjamin Levin and Mordechai Golan,* Civil Action No. 99–1693 (AJL) (the *"Bell* Action"). *See* 24 May 1999 Order of Consolidation. The *Frank* Action was filed on 22 March 1999. The *Bell* Action was filed on 13 April 1999.

On 19 April 1999 and 3 May 1999, the Defendants moved for an extension of time within which to answer the *Frank* Action complaint and the *Bell* Action complaint, respectively. Defendants' request for an extension was granted, and Defendants were allowed until 21 May 1999 to submit an answer.

On 21 May 1999, the Proposed Lead Plaintiffs submitted the Lead Plaintiffs and Lead Counsel Motions and requested the consolidation of the *Frank* and *Bell* Actions. As stated, the *Frank* Action and the *Bell* Action were consolidated by an order, dated 24 May 1999.

### B. *Facts* [2]

#### 1. *The Defendants*

Nice Systems is an Israeli corporation with its principal executive offices located in Tel Aviv, Israel. Nice Systems is a global provider of computer telephony integrated ("CTI") logging, quality measurement, and workflow solutions for voice, data and facsimile transmissions. *See id.* Nice Systems maintains a headquarters in the United States located in Secaucus, New Jersey. Nice ADSs are traded on the Nasdaq National Market System.[3]

2. The facts are derived from the class action complaint (the "Complaint") filed before the consolidation of this matter on 24 May 1999, in *Marvin Frank v. Nice Systems, Ltd., David Arzi, Benjamin Levin and Mordechai Golan,* Civil Action No. 99–1307 (AJL), attached as exhibit A to the Weiss Affidavit. The Complaint filed in the *Frank* Action is relied upon herein because Marvin Frank, named plaintiff in the *Frank* Action, is moving for appointment as lead plaintiff. In addition, all of the Proposed Lead Plaintiffs have stated they have reviewed the complaint filed in the *Frank* Action. *See* Certifications of Proposed Lead Plaintiffs, attached to Weiss Aff. as Exhs. A, B.

David Arzi ("Arzi") is the Chairman of the Board of Directors for Nice Systems. Arzi announced his plans to retire from his position as Chairman of the Board on approximately 31 December 1998.

Benjamin Levin ("Levin") is the President and Chief Executive Officer, and a Director of Nice Systems. Levin is expected to succeed Arzi as Chairman of the Board of Directors upon his retirement.

Mordechai Golan ("Golan") is the Chief Financial Officer and a Director of Nice Systems. Golan is expected to succeed Levin as President.

Arzi, Levin and Golan (the "Individual Defendants") as a result of their positions of control and authority are alleged to have been responsible for the content of various Securities and Exchange Commission ("SEC") filings, press releases and public statements.

#### 2. *The Proposed Lead Plaintiffs*

The Proposed Lead Plaintiffs are a group of individuals consisting of Marvin Frank,("Frank")named plaintiff in the *Frank* Action, and class members Jeremy Eisenberg ("Eisenberg"), Brian Glogower ("Glogower"), Gregory Guinn ("Guinn"), Jain Pradeep ("Pradeep"), Daniel Laser ("Laser"), Rubin Jeffrey ("Jeffrey") and Mark R. and Jane Smith (the "Smiths"). The Proposed Lead Plaintiffs have all reviewed the Complaint and have expressed a willingness to serve as lead plaintiffs in the instant action.[4] *See* Weiss Aff., Exh. C. (attaching certifications from each of the Proposed Lead Plaintiffs)

3. Nice ADSs represent one ordinary share, nominal value one new Israeli Shekel per share.

4. The Proposed Lead Plaintiffs seek to represent a class (the "Class") consisting of all persons who purchased NICE ADSs between 4 February 1998 and 24 September 1998 (the "Class Period") and who suffered damages. *See* Complaint ¶ 16. It is alleged that the members of the Class are so numerous that joinder of all members would be impracticable. *See id.* ¶ 17. Throughout the Class Period, Nice ADSs were actively traded on the Nasdaq. *See* Complaint ¶ 17. While the exact number of members of the Class is not known, it is alleged there are hundreds, and possibly thousands, of members. *See id.*

Frank purchased 100 Nice ADSs at $37.50 per share, and 100 Nice ADSs at $35.50 per share, on 7 May 1998. On 2 September 1998, Frank purchased 100 Nice ADSs at $29.625 per share. It appears Frank still holds all 300 Nice ADSs.

Eisenberg purchased 100 Nice ADSs on 22 September 1998 at $30 1/4 per share. It appears Eisenberg still holds all 100 Nice ADSs.

Glogower purchased 500 Nice ADSs on 5 May 1998 at $43 1/8 per share. Glogower sold all five hundred of his Nice ADSs on 22 December 1998 for $21 3/16 per share.

Guinn purchased twenty Nice ADSs on 2 July 1998 at $37 1/2 per share. It appears Guinn still holds all twenty of his Nice ADSs.

Pradeep purchased 200 Nice ADSs on 29 June 1998 at $37 7/8 per share. Pradeep sold all 200 Nice ADSs on 30 December 1998 for $21 3/8 per share.

Laser purchased Nice ADSs as follows:

| Purchase Date | No. Shares | Price per share |
| --- | --- | --- |
| 7 May 1998 | 200 | $36.125 |
| 26 May 1998 | 50 | $40.88 |
| 2 June 1998 | 200 | $35.25 |
| 2 June 1998 | 100 | $34.94 |
| 4 June 1998 | 25 | $34.50 |
| 27 August 1998 | 100 | $30.50 |
| 23 September 1998 | 200 | $30.00 |

Between 7 May 1998 and 23 September 1998, Laser purchased a total of 875 Nice ADSs. Laser sold 200 Nice ADSs for $39.50 per share on 11 May 1998, 300 Nice ADSs for $38.12 per share on 20 July 1998, and 100 Nice ADSs for $32.50 per share on 14 September 1998. It appears Laser still holds 275 Nice ADSs.

Rubin purchased 499 Nice ADSs on 19 May 1998 for $39 3/4 per share. It appears Rubin still holds all 499 shares.

The Smiths purchased thirty Nice ADSs on 24 September 1998 for $29.9375. It appears the Smiths still hold all thirty Nice ADSs.

### 3. The Factual Allegations

Nice Systems was founded in 1986, and completed an initial public offering in Israel in 1991. See Complaint ¶ 22. In 1996, Nice Systems completed a $20 million initial public offering in the United States. See id. A follow-on offering of $98 million in the United States was completed in 1997. See id.

The ordinary shares of Nice Systems (the "Nice Ordinary Shares") are traded on the Tel Aviv Stock Exchange and the Nice ADSs are actively traded on the Nasdaq. See Complaint ¶ 22. Nice Systems develops, designs, manufactures, markets and services products that provide logging, monitoring, quality measurement and workflow solutions for voice, data and facsimile transmissions. See id. Nice Systems asserts its products are used by a broad range of customers, such as call centers, air traffic control sites, public safety entities, financial institutions and intelligence agencies. See id.

During the initial years of its operations, Nice Systems derived a substantial portion of its revenues from the development of Communications Intelligence ("COMINT") products. See Complaint ¶ 23. Currently, however, Nice Systems derives the majority of its revenues from the sale of its CTI products, which are designed to protect businesses and customers against the risks posed by lost or misinterpreted voice, facsimile or data transmissions. See id. The call center business is the fastest growing market served by Nice Systems, and represents the greatest growth potential for Nice Systems. See id.

In order to capture a greater share of the call center market, Nice Systems acquired Dees Communications, Ltd., a Canadian corporation, in exchange for 435,000 Nice ADSs and $8 million in cash (the "Dees Acquisition").[5] See Complaint ¶ 24. Immediately following the Dees Acquisition, Nice Systems introduced NiceUniverse, a quality measurement solution that purportedly automates call center agent monitoring and screen capture and provides objective evaluation tools to help identify training requirements for call center agents. See id.

The Complaint alleges Nice Systems raced to the market with upgrades to the Nice-

---

**5.** It is alleged the Dees Acquisition was important to the growth plans of Nice Systems because it provided Nice Systems with call center monitoring, quality measurement training and agent productivity enhancement products. See Complaint ¶ 24.

Universe product in an effort to avoid being perceived as having entered the call center market by purchasing Dees and simply "flying its flag over Dees products." Complaint ¶ 25. The upgrades to NiceUniverse, marketed as NiceUniverse version 3.0 and version 3.1, were promoted as highly innovative and technologically advanced products that met the current needs of call centers and complied with the systems requirements of its various distributors. *See id.*

The Complaint alleges Nice Systems materially misstated the abilities of the NiceUniverse products. *See* Complaint ¶ 26. The Complaint further alleges Nice Systems failed to disclose the Nice Universe products were not ready for commercial distribution, were plagued with numerous "bugs" which hindered their commercial utility, and as a result did not comply with the system requirements of the largest distributors of Nice Systems. *See id.* The truth concerning the NiceUniverse products was not disclosed until 24 September 1998, when Nice Systems announced NiceUniverse did not meet the needs of its customers. *See id.* Nice Systems stated it was forced to stop manufacturing and marketing the NiceUniverse products and would need to completely revamp the NiceUniverse product line to make it commercially viable. *See id.*

The Complaint alleges several press releases and submissions to the SEC were materially false and misleading. The alleged misleading statements made during the Class Period are as follows.

### 4 February 1998 Press Release

On 4 February 1998, Nice Systems issued a press release (the "4 February 1998 Press Release"), published on *PR Newswire*, in which it announced the introduction of NiceUniverse at the 1998 Call Center Trade Show. *See* Complaint ¶ 28. According to the 4 February 1998 Press Release, Nice Systems "unveiled the newest release of its call center performance measurement solution, NiceUniverse, version 3.0. . . . The product is integrated with Nice's NiceLog and NiceCLS systems, and supports the industries leading switches including Nortel, Lucent and Aspect." *Id.* Commenting on the introduction of NiceUniverse version 3.0, Compa-

ny spokesman Morgan Sturdy ("Sturdy"), head of Nice System's North American Sales Division stated, in part:

> *The focus of our application is to address the compliance, performance and risk management issues of the call center.* Our goal is to offer clients logging and monitoring systems that are *easily integrated* with existing *computer network and telecom environments.*

*Id.* (emphasis in the Complaint).

### The Three March 1998 Press Release

On 3 March 1998, Nice Systems issued a press release (the "3 March 1998 Press Release"), published on *M2 Presswire*, announcing its acquisition of IBS Corporation, a California-based maker of software used by call centers. *See* Complaint ¶ 31. In connection with acquisition of IBS Corporation, Levin stated:

> We believe that the acquisition of IBS, following the acquisition of Canadian based Dees Communications in September 1997, will support our ongoing expansion into the fast growing call center market. *With IBS's technology, products and customer base, and Nice's CTI logging and quality measurement solutions, we now have the broadest range of call center logging and quality solutions in the market.*

*Id.* (emphasis in the Complaint).

### The 23 April 1998 Press Release

On 23 April 1998, Nice Systems issued a press release (the "23 April 1998 Press Release"), on PR Newswire, concerning the ability of its NiceUniverse products to integrate with its customers pre-existing systems. *See* Complaint ¶ 32. The 23 April 1998 Press Release stated Nice Systems had completed the installation of it NiceUniverse quality measurement system at Advanta Mortgage. *See id.* According to the 23 April 1998 Press Release, "this installation showcases Nice's newest Computer Telephony Integrated (CTI) quality measurement solution, NiceUniverse 3.0, fully integrated with Aspects Automated Call Distributor (ACD)." *Id.* The 23 April 1998 Press Release further stated:

*Advanta, a provider of mortgage and home equity loans, will use the system to monitor its agents to identify agent training requirements and improve agent performance levels in the call center.* Integrated with Advanta's Windows 95 network, NiceUniverse allows multiple reviewers to playback [sic] recorded agent transactions and analyze the call center's performance levels using the systems powerful evaluation tools.

\* \* \* \* \* \*

Integration with lading PBX/ACDs is a core component of our business strategy. *We are pleased to introduce a truly reliable quality assurance solution tightly integrated with Aspect's ACD.*

*Id.*

### The 6 May 1998 Press Release

On 6 May 1998, Nice Systems issued a press release (the "6 May 1998 Press Release"), on *PR Newswire,* announcing record results for the first quarter of 1998. *See* Complaint ¶ 33. Commenting upon the performance of Nice Systems in the first quarter of 1998, Levin stated:

*The first quarter of 1998 shows that Nice continues to benefit from its technological leadership and strong competitive position.* In addition to other sectors, we are focusing on *the call center market which is expected to grow significantly* in the coming years.

*Id.* (emphasis in the Complaint).

### The 18 May 1998 Press Release

On 18 May 1998, Nice Systems issued a press release (the "18 May 1998 Press Release"), on *PR Newswire,* concerning the ability of the NiceUniverse system to integrate with its customers pre-existing systems. *See* Complaint ¶ 36. The 18 May 1998 Press Release stated Electric Insurance Company had implemented the NiceUniverse quality measurement system. *See id.* The 18 May 1998 Press Release further stated the NiceUniverse system was fully integrated with the Microsoft Windows–NT network and Lucent PBX operated by Electric Insurance Company. *See id.*

### The 26 June 1998 Form 20–F

On or about 26 June 1998, Nice Systems, pursuant to the Exchange Act, filed its Form 20–F with the SEC for the year ended 31 December 1997 (the "26 June 1998 Form 20–F"). *See* Complaint ¶ 38. The 26 June 1998 Form 20–F allegedly contained the following misleading statements concerning the NiceUniverse product line:

*NiceUniverse, introduced in February 1998, is a quality measurement solution that automates call center agent monitoring and screen capture. The system provides objective evaluation tools and helps identify training requirements for call center agents.* NiceUniverse uses a switch-independent CTI interface that integrates with ACDs and PC networks. This enables NiceUniverse to monitor and record agent sessions (voice and screen) on a user-defined schedule and store them in compressed digital format. Sessions are later retrieved by the reviewers from their network PCS and agent performance is graded using customized on-screen templates. From these templates and other data, NiceUniverse generates detailed reports, statistics and graphs to help identify training requirements and set relevant benchmarks for call center agents.

\* \* \* \* \* \*

The Company's CTI systems are generally sold with a warranty, the term of which is usually one year after shipment. Longer warranty periods are applicable to sales of certain international and governmental markets. Broader warranty and service coverage is provided in certain instances and is usually made available to customers through the Company's distributors on a contractual basis for an additional charge. After the expiration of the warranty period, customers may purchase a renewable maintenance agreement with the Company's dealers [that] generally provides for maintenance, upgrades of standard system software and on-site repair or replacement. The Company often receives a certain percentage of the value of such agreements in consideration for its commitment for back-up support to its dealers. *To date the*

*Company has not experienced any significant product returns or requests for repairs.*

*Id.* (emphasis in the Complaint).

### The 5 August 1998 Press Release

On 5 August 1998, Nice Systems issued a press release (the "5 August 1998 Press Release"), on *PR Newswire,* announcing record results for the second quarter of 1998. *See* Complaint ¶ 42. Commenting upon the performance of Nice Systems in the second quarter of 1998, Levin stated:

> *"Results for the second quarter reflect our improved position in the call center market. Our strategic decision to focus on call centers in 1998,* highlighted by the acquisition of Dees Communications last year and the acquisition of the assets of IBS this quarter, *is paying off handsomely.* Our leading position in the North American call center market is consistent with Nice's dominance in the financial institutions and the air traffic control markets."
>
> Mr. Levin also reported that *the Company is currently strengthening its professional and technical services and capabilities in the North American market by moving key professionals from Israel to the US.* "We are bringing more experts closer to this booming market. These changes should improve our ability to respond better to customers' needs in a very dynamic and growing market."

*Id.* (quoting Levin) (emphasis in the Complaint).

### The 17 August 1998 Press Release

On 17 August 1998, Nice Systems issued a press release (the "17 August 1998 Press Release"), on *PR Newswire,* concerning the ability of the NiceUniverse system to integrate with its customers' pre-existing systems. *See* Complaint ¶ 45. Levin stated: "The call center market is an immense and growing business sector worldwide. It generates high margins and has the potential of increasing our revenues significantly by the turn of the century." *Id.*

6. This date marks the close of the Class Period.

### The 8 September 1998 Press Release

On 8 September 1998, Nice Systems issued a press release (the "8 September 1998 Press Release") on *PR Newswire* announcing the launch of its Professional Services Division. *See* Complaint ¶ 46. In connection with this announcement, Sturdy stated:

> In today's competitive call center environment, customer-service oriented companies are looking for *more than just great technology* when improving their operations. *Our suite of value-added professional services provide [sic] customers a comprehensive program that encompasses implementation, technical training and call center consultative services that go beyond the technology.*

*Id.* (emphasis in the Complaint).

### The 24 September 1998 Press Release

The Complaint alleges that Nice Systems disclosed its true operating condition in a press release, dated 24 September 1998 (the "24 September 1998 Press Release").[6] *See* Complaint ¶ 48. In the 24 September 1998 Press Release, Nice Systems announced its third quarter results would fall materially short of the expectations of analysts. *See id.* Nice Systems attributed this shortfall to difficulties associated with its NiceUniverse products and a slowdown in orders received from the financial trading market sector. *See id.*

Commenting on the third quarter performance of Nice Systems, Levin stated:

> *We have decided to act swiftly to modify our product offering for the low-end and mid-range market and to base it on our well-received high-end solution,* providing better offering to the market. As a result, *we anticipate a six-month delay in revenues for this product.* Nice is planning to release a new and enhanced quality measurement solution for the low-end to mid-range market at the end of 1998. *We anticipate that Nice will return to its previous growth rate in the beginning of 1999.*

*See* Complaint ¶ 48 (emphasis in the Complaint).

The Complaint alleges the reaction of the stock market to the 24 September 1998 Press Release was "punitive and immediate." Complaint ¶ 49. On 25 September 1998, the value of Nice ADSs fell 54%, or $14.19 per share, to close at $15.63. *See id.* This drop represented a more than $150 million loss of the market capitalization of Nice Systems. *See id.*

The Complaint alleges that, during the Class Period, Defendants materially misled the investing public and artificially inflated the price of Nice ADSs. *See* Complaint ¶ 53. The Complaint further alleges the 4 February 1998 Press Release, 3 March 1998 Press Release, 23 April 1998 Press Release, 6 May 1998 Press Release, 18 May 1998 Press Release, 26 June 1998 Form 20–F, 5 August 1998 Press Release, 17 August 1998 Press Release and 8 September 1998 Press Release were false and misleading and omitted facts necessary to make the statements included therein not false and misleading. *See id.*

The Complaint asserts Defendants failed to disclose material information that was known to them at the time of the challenged press releases and SEC submissions. *See* Complaint ¶ 53. The alleged withheld material information included:

(i) the NiceUniverse systems were not "easily integrated with existing ... telecom environments";

(ii) the NiceUniverse systems had not been certified by distributors, and therefore the systems could not be effectively sold by such distributors;

(iii) as a result of the initial negative feedback from customers concerning the NiceUniverse products, Nice Systems did not have a reasonable basis for claiming its revenues would continue to grow or for stating its products would remain in demand;

(iv) as a result of customer dissatisfaction, Nice Systems would be forced to quickly upgrade its Nice Universe products before abandoning most them entirely;

(v) Nice Systems attempted to gain market share in the call center market, a market it believed to be highly compet-

itive, by selling products Nice Systems knew did not suit the needs of its customers;

(vi) many customers had complained about their NiceUniverse systems such that Nice Systems could not truthfully state it had not experienced any significant product returns or requests for repairs; and

(vii) at the time the 26 June 1998 Form 20–F was published, Nice Systems had sent technical support staff to the United States to remedy material problems Nice Systems was then experiencing.

*See* Complaint ¶ 53.

*Discussion*

A. *The Private Securities Litigation Reform Act of 1995*

Congress enacted the Private Securities Litigation Reform Act, 15 U.S.C. § 78u–4, (the "PSLRA") to remedy perceived abuses in the securities class action litigation. *See In re Milestone Scientific Sec. Litig.,* 183 F.R.D. 404, 411 (D.N.J.1998) ("*Milestone I*"); *In re Cendant Corp. Litig.,* 182 F.R.D. 144, 145 (D.N.J.1998); *In re Oxford Health Plans, Inc., Sec. Litig.,* 182 F.R.D. 42, 43 (S.D.N.Y.1998); *Chill v. Green Tree Financial Corp.,* 181 F.R.D. 398, 404–05 (D.Minn. 1998); *Gluck v. Cellstar Corp.,* 976 F.Supp. 542, 543–44 (N.D.Tex.1997); *Lax v. First Merchants Acceptance Corp.,* 1997 WL 461036, at *2 (N.D.Ill. 11 Aug. 1997).

Prior to the enactment of the PSLRA, plaintiffs in securities fraud cases tended to profit irrespective of the culpability of the defendants, most of whom chose settlement over prolonged and expensive litigation. *See Milestone I,* 183 F.R.D. at 411; *Gluck,* 976 F.Supp. at 543–44. These cases were constantly subjected to manipulation by lawyers and "professional plaintiffs," whose financial holdings in the defendant issuers were insignificant. *See* Conference Report on Securities Litigation Reform, H.R.Rep. No. 369, 104th Congress, 1st Sess. 31, *reprinted in* 1995 U.S.C.C.A.N. 679, 730–34 (the "Conference Report"). Often controlling the securities class actions, these plaintiffs and lawyers

reaped huge profits, to the detriment of shareholders with more significant financial holdings. *See id.; see also Milestone I,* 183 F.R.D. at 411; *Cendant,* 182 F.R.D. at 145; *D'Hondt v. Digi Int'l Inc.,* 1997 WL 405668 at * 2 (D.Minn. April 3, 1997).

The purpose behind the PSLRA is to " 'empower investors so that they, not their lawyers, control private securities litigation' by allowing the Court to ensure the transfer of 'primary control of private securities litigation from lawyers to investors.' " *See Chill,* 181 F.R.D. at 407 (quoting Conference Report at 683, 685); *Gluck,* 976 F.Supp. at 546.

Specifically, the PSLRA provides a method for identifying the plaintiff or plaintiffs who are the most strongly aligned with the class of shareholders, and most capable of controlling the selection and actions of counsel. *See* Conference Report at 731; *see also Fischler v. AmSouth Bancorp.,* 1997 WL 118429 at *1 (M.D.Fla. Feb. 6, 1997). In so providing, the PSLRA attempts to replace the outdated practice of selecting representative plaintiffs by a "race to the courthouse," with a selection system which focuses on the adequacy of the representative. *See* Conference Report at 689; *see also Milestone I,* 183 F.R.D. at 412; *Cendant,* 182 F.R.D. at 145–46; *Ravens v. Iftikar,* 174 F.R.D. 651, 654 (N.D.Cal. 1997).[7]

The PSLRA added to the Exchange Act § 21D ("Section 21D"), as amended, 15 U.S.C. § 78u–4. Section 21D sets forth procedures for early notification to potential class members of the filing of the class action. Under section 21D(a)(3), a plaintiff seeking to represent a class:

Shall cause to be published in a widely-circulated national business-oriented publication or wire service, a notice advising members of the purported class—

(I) of the pendency of the action, the claims asserted therein, and the purported class period;

(II) *that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the Court to serve as lead plaintiff of the purported class.*

15 U.S.C. § 78u–4(a)(3)(A)(i)(emphasis added).

The PSLRA also altered the procedure by which the lead plaintiff for the purported class is appointed. As stated, pursuant to the PSLRA, the plaintiff who is "first to file" is no longer assured of the lead plaintiff position. Section 21D(a)(3)(B)(i) provides:

Not later than 90 days after the date on which a notice is published ... the court shall consider any motion made by a purported class member in response to the notice, including any motion by a class member who is not individually named as a plaintiff in the complaint or complaints, and *shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class members* ...

15 U.S.C. § 78u–4(a)(3)(B)(i)(emphasis added). In eschewing the "first come, first serve" determination of the lead plaintiff in favor of the most adequate plaintiff, the PSLRA "ensure[s] that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers." *See In re Donnkenny Inc. Sec. Litig.,* 171 F.R.D. 156, 157 (S.D.N.Y.1997)(citing Conference Report at 730–34).

The selection of the most adequate plaintiff under the PSLRA is governed by a rebuttable presumption:

[T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that—

(aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);

---

7. The PSLRA did not completely eliminate the "race to the courthouse," however. As detailed below, plaintiffs who are first to file suit are obligated to provide notice to other purported class members of the asserted claims and the purported class period. *See* 15 U.S.C. § 78u–4(a)(3)(A). Plaintiffs who are first to file, moreover, are in a better position to aggregate plaintiffs in an effort to obtain the largest financial interest in the litigation, an important aspect of lead plaintiff status.

(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirement of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(I).

This presumption of adequacy

*may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—*

(aa) will not fairly and adequately protect the interest of the class; or

(bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)(emphasis added).

The PSLRA further provides that once the most adequate plaintiff is selected, the "most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." Title 15 U.S.C. § 78u–4(a)(3)(B)(v).

### B. *Appointment of Lead Plaintiffs*

#### 1. *The Notification Requirement*

■ In the instant case, the notification requirement has been met. The *Frank* Action was the initial action filed. Pursuant to Section 21D(a)(3)(A)(i), the plaintiff in the *Frank* Action published the notice of pendency of the instant action (the "Notice of Pendency") in a widely-circulated national business-oriented wire service, the *Business Wire*.[8] The Notice of Pendency adequately apprised members of the Class of their right to move the Court to serve as lead plaintiff or plaintiffs no later than sixty days from the date of publication. *See* Notice of Pendency, attached to Weiss Aff. as Exh. C. In response to the Notice of Pendency, the Proposed Lead Plaintiffs filed the pending Lead Plaintiffs Motion, as required under Section 21D(a)(3)(B)(II)(aa).

A motion for the appointment of lead plaintiff must be filed within sixty days of the publication of the Notice of Pendency. *See* 15 U.S.C. § 78u–4(a)(3)(A)(i). There is no dispute as to the timeliness of the Lead Plaintiffs Motion made in response to the Notice of Pendency. The Notice of Pendency was published on 22 March 1999. *See* Notice of Pendency. The Lead Plaintiffs Motion was filed on 21 March 1999. Accordingly, the Lead Plaintiffs Motion was timely filed.

#### 2. *The Largest Financial Interest Requirement*

It appears Proposed Lead Plaintiffs, as a group,[9] represent the largest financial inter-

---

**8.** The PSLRA does not define "widely-circulated" or "wire service." *See* 15 U.S.C. § 78u–4(a)(3)(A)(i). Congress, however, intended publication to "encompass a variety of mediums [sic], including wire, electronic, or computer services." *See* Conference Report at 733; *see also Greebel v. FTP Software, Inc.,* 939 F.Supp. 57, 62 (D.Mass.1996). The *Business Wire* is a business-oriented wire service within the meaning of the PSLRA. *See Greebel,* 939 F.Supp. at 62 ("[T]he mere fact that *Business Wire* arrives at a print publication via an electronic signal, rather than in the manner of a traditional wire service, does not disqualify it as a 'wire service' within the meaning of the statute."). Additionally, the *Business Wire* is subscribed to by "hundreds of print publications and wire services, encompassing news media in all fifty states," and is thus "widely-circulated." *See id.; First Merchants Acceptance Corp.,* 1997 WL 461036 at *4 ("[T]he court must make its own interpretation as to what the term ['widely-circulated'] means."). The *Business Wire* has been recognized as a suitable vehicle for satisfying the notice and publication requirements of the PSLRA. *See, e.g., Greebel,* 939

F.Supp. at 62–64; *Lax v. First Merchants Acceptance Corp.,* 1997 U.S.Dist. LEXIS 11866 at *2, 1997 WL 461036 at *1 (N.D.Ill. 6 Aug. 1997).

**9.** Certain of members of the Proposed Lead Plaintiffs group appear to have purchased a relatively small number of shares. Guinn, for example, purchased only twenty Nice ADSs during the Class Period. Similarly, the Smiths purchased only thirty Nice ADSs during the Class Period, and Eisenberg purchased only 100 Nice ADSs during the class period. The Proposed Lead Plaintiffs have not offered any explanation as to why Guinn, Eisenberg and the Smiths were included as representatives of the largest financial interest. There has been, however, no objection raised to the inclusion of Guinn, Eisenberg and the Smiths in the group of the Proposed Lead Plaintiffs. In the absence of such an objection, the analysis will proceed as to whether the group, as presented by Proposed Lead Plaintiffs, meets the requirements for appointment as lead plaintiffs. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II) (the presumption favoring appointment of lead

est of any class member. As discussed, a presumption of adequacy arises where the "group of persons" having the largest financial interest among the named plaintiffs in the class action seeks appointment as lead plaintiff. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(bb). The PSLRA does not define "largest financial interest" or provide guidance as to how such a determination is made. One District Court has found four factors "surely relevant" to this inquiry:

> (1) the number of shares purchased; (2) the number of net shares purchased; (3) the total net funds expended by the plaintiffs during the class period; and (4) the approximate losses suffered by the plaintiffs.

*First Merchants Acceptance Corp.*, 1997 WL 461036 at *5; *see also In re Olsten Corp. Sec. Litig.*, 3 F.Supp.2d 286, 295 (E.D.N.Y.1998)(recognizing same four factors).

During the Class Period, the Proposed Lead Plaintiffs purchased 2,524 Nice ADSs. *See* Certifications of Proposed Lead Plaintiffs, Attached to Weiss Aff. at Exhs. A, B. Collectively, the Proposed Lead Plaintiffs expended $93,633.88 on their purchases of Nice ADSs during the Class Period. *See id.* Proposed Lead Plaintiffs collectively assert that no other applicant or applicant group has sustained greater financial losses in connection with the purchase and/or sale of Nice ADSs during the Class Period. *See* Moving Brief at 9.[10]

### 3. *Rule 23 Requirements*

The Proposed Lead Plaintiffs appear to "otherwise satisf[y] the requirements of Rule 23 of the Federal Rules of Civil Procedure [ ('Rule 23') ]." *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(cc); *see also Chill*, 181 F.R.D. at 408 ("Ultimately, the PSLRA channels the concern, as to the adequacy of repre-

sentation, through Rule 23."). Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defense of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

"A wide-ranging analysis under Rule 23 is not appropriate [at this initial stage of the litigation] and should be left for consideration of a motion for class certification." *Fischler*, 1997 WL 118429 at *2; *see also Gluck*, 976 F.Supp. at 546 ("Evidence regarding the requirements of Rule 23 will of course, be heard in full at the class certification hearing. There is no need to require anything more than a preliminary showing at this stage.").

█ Accordingly, "discovery regarding the[ ] elements [of Rule 23] is only allowe[d] if another purported member of the class can demonstrate a reasonable basis for finding the presumptively most adequate plaintiff incapable of adequately representing the class." *See Gluck*, 976 F.Supp. at 546 (citing 15 U.S.C. § 78u–4(a)(3)(B)(iv)). In the instant case, the Motion is unopposed. Discovery regarding the satisfaction of the elements of Rule 23, therefore, is not warranted. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iv).

█ A fact-specific inquiry is nonetheless necessary under Rule 23 to determine whether the presumptively most adequate plaintiff will nevertheless betray the interests of the class. *See Milestone I*, 183 F.R.D. at 414; *Chill*, 181 F.R.D. at 408; *In re Ford Motor Co. Bronco II Product Liability Litig.*, 177 F.R.D. 360, 367 (E.D.La.1997). The

plaintiff may only be rebutted upon proof presented by a member of the purported plaintiff class). The propriety of accepting the appointment of all of the Proposed Lead Plaintiffs, however, shall also be addressed below.

10. For purposes of the lead Plaintiffs Motion, the assertion of the Proposed Lead Plaintiffs is accepted as true. Although the Proposed Lead

Plaintiffs have not presented a calculation of their estimated damages, no other individual or group has moved for appointment as lead plaintiff in this matter, and there has been no objection to the claim of the Proposed Lead Plaintiffs that they have the largest financial stake in this litigation.

inquiry should "focus[ ] on the qualities of the class representatives enumerated in Rule 23(a)(3) and 23(a)(4), that is typicality and adequacy." *Gluck,* 976 F.Supp. at 546.[11]

■ The Proposed Lead Plaintiffs have sufficiently demonstrated, at this preliminary stage, the requisite typicality and adequacy. The typicality requirement under Rule 23(a)(3)

> permits the court to assess whether the class representatives themselves present those common issues of law and fact that justify class treatment, thereby tending to assure that the absent class members will be adequately represented.

*Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985); *see also General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 159, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 311 (3d Cir. 1998); *Baby Neal v. Casey,* 43 F.3d 48, 57 (3d Cir.1994). This requirement ensures alignment of the interests of the Class with those of the class representatives "so that the [class representatives] will work to benefit the entire class through the pursuit of their own goals." *In re Prudential,* 148 F.3d at 311; *see also Georgine v. Amchem Products, Inc.,* 83 F.3d 610, 631 (3rd Cir.1996), *aff'd, Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689(1997); *Baby Neal,* 43 F.3d at 57.

■ Rule 23(a)(3) does not require the claims of the Proposed Lead Plaintiffs be identical to those of the class. *See In re Prudential,* 148 F.3d at 311; *Eisenberg,* 766 F.2d at 786; *Weiss v. York Hospital,* 745

F.2d 786, 809 (3d Cir.1984); *Easton & Co. v. Mutual Benefit Life Ins. Co.,* 1993 WL 89146 at *3 (D.N.J. Feb. 2, 1993). Rather, the typicality requirement is satisfied when the "plaintiff's claim arises from the same event or course of conduct that gives rise to the claims of other class members and is based on the same legal theory." *See Baby Neal,* 43 F.3d at 58; *Eisenberg,* 766 F.2d at 786. The typicality requirement is not met, however, where the " 'plaintiff's factual or legal stance is not characteristic of that of other class members.' " *Gunter v. Ridgewood Energy Corp.,* 164 F.R.D. 391, 395 (D.N.J.1996)(quoting *Weiss,* 745 F.2d at 808).

■ It appears the claims of the Proposed Lead Plaintiffs are typical of the Class. The Proposed Lead Plaintiffs assert the typicality requirement has been met because the Proposed Lead Plaintiffs and the absent members of the Class have similar legal claims arising out of the alleged false statements of the Defendants in the press releases and 26 June 1998 Form 20–f. *See* Moving Brief at 11 (citing *Weiss,* 745 F.2d at 809 & n. 36; *Seidman v. American Mobile Systems, Inc.,* 157 F.R.D. 354, 360 (E.D.Pa.1994)); *see also In re Prudential,* 148 F.3d at 311; *Baby Neal,* 43 F.3d at 56; *Hoxworth v. Blinder, Robinson & Co., Inc.,* 980 F.2d 912, 923 (3rd Cir.1992)(quoting *Grasty v. Amalgamated Clothing & Textile Workers Union,* 828 F.2d 123 (3d Cir.), *cert. denied,* 484 U.S. 1042, 108 S.Ct. 773, 98 L.Ed.2d 860 (1988))(" 'factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members.' "); *Easton,* 1993 WL 89146 at *3.

---

11. A defendant or defendants may not object to the adequacy or typicality of the proposed lead plaintiff at this preliminary stage of the litigation. *See Gluck,* 976 F.Supp. at 550 ("Defendants have no standing to oppose the appointment of Lead Plaintiff at this stage of the litigation."); *see also Zuckerman,* 1997 WL 314422 at *2; *Greebel,* 939 F.Supp. at 60–61. "The statute is clear that only potential plaintiffs may be heard regarding appointment of a Lead Plaintiff." *Gluck,* 976 F.Supp. at 550. The PSLRA specifically provides "the court shall consider *any motion made by a purported class member*" in determining the adequacy of a proposed lead plaintiff. *See* 15 U.S.C. § 78u–4(a)(3)(B)(i)(emphasis added); *see also* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)("The presumption

described in 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I) ] may be rebutted only upon proof by *a member of the purported plaintiff class . . . .* ")(emphasis added).

However, the determination that the Proposed Lead Plaintiffs meet the requirements of Rule 23 does not preclude the possibility of revisiting the issue at the class certification stage. The opportunity for Nice Systems and/or the Individual Defendants to contest class certification on these grounds is preserved. *See Zuckerman,* 1997 WL 314422 at *2; *Gluck,* 976 F.Supp. at 547 (quoting *Greebel,* 939 F.Supp. 57, 60–61 (D.Mass. 1996); *In re Cephalon Sec. Litig.,* 1996 WL 515203 (E.D.Pa. Aug. 27, 1996).)

The Complaint contains allegations and a recitation of facts which are similar, if not identical, to other class action complaint filed prior to consolidation. *Compare* Complaint *with* complaint filed in *Bell* Action. The claims and legal theories of the Proposed Lead Plaintiffs are not so "markedly different" from those of other class members, so as to render them atypical. *See Eisenberg,* 766 F.2d at 786 (citing *Weiss,* 745 F.2d at 809 n. 36).

■ Similarly, the adequacy of representation is not in issue. In this Circuit, the adequacy of the class representative depends upon the following two factors:

> (1) the plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation, and (2) the plaintiff must not have interests antagonistic to the class.

*Weiss,* 745 F.2d at 811; *see also In re Prudential,* 148 F.3d at 312; *Amchem Products, Inc.,* 83 F.3d at 630; *In re General Motors Corp.,* 55 F.3d 768, 800 (3d Cir.1995); *Hoxworth,* 980 F.2d at 923.

Adequacy, for purposes of the lead plaintiff determination, is contingent upon both the existence of common interests between the proposed lead plaintiffs and the class, and a willingness on the part of the proposed lead plaintiff to vigorously prosecute the action.

■ It appears the Proposed Lead Plaintiffs do not have interests antagonistic to the Class. Indeed, as presented, the Proposed Lead Plaintiffs appear to have the largest financial interest, having purchased 2,524 Nice ADSs at a cost of $93,633.88. *See* Certifications of Proposed Lead Plaintiffs, attached to Weiss Aff. as Exhs A, B. This financial stake in the litigation provides an adequate incentive for the Proposed Lead

Plaintiffs to vigorously prosecute the action. *See Milestone I,* 183 F.R.D. at 416; *Cendant,* 182 F.R.D. at 148.

Irrespective of the amount of money at stake, it appears, as asserted by the Proposed Lead Plaintiffs, that their "interests are squarely aligned with the absent class members, because each movant: (i) purchased Nice ADSs; (ii) during the relevant time period; and (iii) suffered damages thereby." *See* Moving Brief at 11. It appears the goals of the Proposed Lead Plaintiffs in pursuing the litigation against Nice Systems and the Individual Defendants also do not diverge from those of the Class. In addition, review of the firm resumes of Counsel for the Proposed Lead Plaintiffs (the "Proposed Counsel"), demonstrates Proposed Counsel are qualified, experienced and able to conduct this litigation in a professional manner. *See* Proposed Counsel Firm Resumes, attached to Weiss Aff. as Exhs. D, E.[12]

### 4. *Presumption Not Rebutted*

The presumption of adequacy has not been rebutted. As observed, the presumption may be overcome by showing the Proposed Lead Plaintiffs will not "fairly and adequately protect the interest of the [C]lass," or are "subject to unique defenses that render [the Proposed Lead Plaintiffs] incapable of adequately representing the Class." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II).

As discussed, in the instant action, the adequacy of the Proposed Lead Plaintiffs has not been challenged. Absent such a challenge, the presumption of adequacy survives as to the group of the Proposed Lead Plaintiffs. *See Zuckerman,* 1997 WL 314422 at *2 (where "[n]o purported class member has presented evidence to rebut this presump-

---

12. At this preliminary stage, an examination of the remaining requirements of Rule 23 is not necessary. *See In re Oxford Health Plans, Inc., Sec. Litig.,* 182 F.R.D. 42, 49 (S.D.N.Y.1998)("Typicality and adequacy of representation are the only provisions relevant to a determination of lead plaintiff under the PSLRA."); *Olsten,* 3 F.Supp.2d at 296 ("the court need only consider whether [potential lead plaintiffs] meet[ ] the typicality and adequacy standard of Rule 23."); *Fischler,* 1997 WL 118429 at *2; *Gluck,* 976 F.Supp. at 546.

In any event, it appears, at this stage, the requirements of numerosity and common questions of law or fact are satisfied. *See* Fed. R.Civ.P. 23(a). Proposed Lead Plaintiffs allege there are hundreds and possibly thousands of members in the Class. In addition, the alleged misstatements are contained in common documents, including SEC filings and press releases to the investing public.

tion, ... the Court will appoint the movants as lead plaintiffs"); *D'Hondt,* 1997 WL 405668 at \*4 (in delegating the rebuttal of the presumption to members of the putative class, "Congress placed the principal responsibility, for investigating the propriety of any proposed Lead Plaintiff, to the purported class members"); *Gluck,* 976 F.Supp. at 547. The propriety of appointing each individual member of the Proposed Lead Plaintiffs is addressed below.

5. *Propriety of Multiple Lead Plaintiffs*

■ The fact that a group, as opposed to a single individual, is proposed as lead plaintiff does not necessarily render the Proposed Lead Plaintiffs inadequate. The PSLRA expressly provides a "group of plaintiffs" may be deemed most adequate plaintiffs. *See* 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). It has also been held that the appointment of more than one lead plaintiff does not violate the PSLRA. *See Oxford,* 182 F.R.D. at 48–49; *In re Cephalon,* 1996 WL 515203 at \*1 (E.D.Pa. Aug. 27, 1996).

While the PSLRA does not limit the number of proposed lead plaintiffs, a "rule of reason prevails." *See Chill,* 181 F.R.D. at 409.

> The assertion can legitimately be made that the larger the number of proposed Lead Plaintiffs, the greater the dilution of the control that those Plaintiffs can maintain over the conduct of the putative class action ....

*D'Hondt,* 1997 WL 405668 at \*3. The inevitable dilution of control stemming from the appointment of multiple lead plaintiffs may result in weakened bargaining power of the lead plaintiffs. In particular, multiple lead plaintiffs may be hampered in their collective ability to effectively negotiate retention agreements and supervise the conduct of counsel. *See Cendant,* 182 F.R.D. at 148 ("[R]epresentation by a disparate group of plaintiffs, each seeking only the protection of its own interests, could well hamper the force and focus of the litigation."). In this regard, the appointment of multiple lead plaintiffs may

> detract from the [PSLRA's] fundamental goal of client control, as it would inevitably

delegate more control and responsibility to the lawyers for the class and make the class representative more reliant on the lawyers.

*Gluck,* 976 F.Supp. at 549–50; *see Steiner v. Frankino,* No. 1:98 CV 0264, slip op. at 12 (N.D. Ohio 16 July 1998); *Donnkenny,* 171 F.R.D. at 157–58.

■ One court, in appointing co-lead plaintiffs, reasoned that multiple lead plaintiffs allows for "diverse representation." *See Oxford,* 182 F.R.D. at 49. Diverse representation is, however, an insufficient rationale justifying the appointment of multiple lead plaintiffs. *See Cendant,* 182 F.R.D. at 148 (rejecting "the argument that additional plaintiffs bring to the litigation other counsel capable of advancing additional funds" as a basis for appointing multiple lead plaintiffs). Focusing on considerations such as diverse representation and additional financing overlooks the fundamental goal of the PSLRA— the empowerment of a unified force to control the litigation. *See* Conference Report at 683, 685; *Gluck,* 976 F.Supp. at 549–50.

Where multiple lead plaintiffs have divergent interests, the leadership of a class may be divided, and rendered factious. While the PSLRA refers to "a person or group of persons" as capable of serving as the lead plaintiff, the surrounding statutory language forecloses the appointment of multiple groups or multiple persons not part of a cohesive group. Significantly, apart from the sole reference to a "group of persons," the PSLRA is worded in the singular, providing a mechanism for the appointment of "the most adequate *plaintiff,*" not the most adequate plaintiffs. *See* 15 U.S.C. § 78u– 4(a)(3)(B)(i) and (iii).

When considering the Lead Plaintiffs Motion, the policies behind the PSLRA must be recognized. The composition of the Proposed Lead Plaintiffs must be scrutinized carefully.

In the instant action, the Proposed Lead Plaintiffs consist of nine individuals: Frank, named plaintiff in the *Frank* Action, and class members Eisenberg, Glogower, Guinn, Pradeep, Laser, Jeffrey and the Smith. Although the interests of Proposed Lead Plain-

tiffs appear to be aligned, there is a concern regarding the division of authority and dilution of control. Further, it appears the appointment of all of the Proposed Lead Plaintiffs will effectuate a dilution of control, and may hinder the progress of this litigation.

The Proposed Lead Plaintiffs request the appointment of nine individuals as lead plaintiffs. The finite boundaries of the Class Period and review of the allegations presented in the instant case demonstrate the appointment of nine lead plaintiffs does not present any benefit that could not be achieved by the appointment of a lesser number. Further, it appears the appointment of a lesser number of Proposed Lead Plaintiffs will further a fundamental goal of the PSLRA—the empowerment of a unified force to control the litigation. *See* Conference Report at 683, 685; *Gluck,* 976 F.Supp. at 549–50.

In the instant case, Proposed Lead Plaintiffs have sought the appointment of Guinn, Eisenberg and the Smiths as part of a group alleged to have the greatest financial interest in the instant litigation. *See* Moving Brief at 9. Guinn, however, purchased only 20 Nice ADSs during the Class Period. This purchase represents only .8% of the $93,633.88 expended by the Proposed Lead Plaintiffs on Nice ADSs.

In addition, Eisenberg purchased only 100 Nice ADSs during the Class Period, while the Smiths purchased only 30 Nice ADSs during the Class Period. These purchases represents only 3.23% and .959%, respectively, of the $93,633.88 expended by the Proposed Lead Plaintiffs on Nice ADSs.

The relatively small interest of Guinn, Eisenberg and the Smiths in the instant litigation appears to distinguish their interests from those of the remaining Proposed Lead Plaintiffs. The PSLRA was designed to provide a method for identifying the plaintiff or plaintiffs who are most strongly aligned with the shareholder class. *See* Conference Report at 731; *Fischler,* 1997 WL 118429 at *1. Guinn, Eisenberg and the Smiths do not appear to fall within that category of plaintiffs.

As mentioned, there has been no objection raised to the Lead Plaintiffs motion

submitted by the Proposed Lead Plaintiffs. District Courts, however, have an obligation to review applications for the appointment of lead plaintiff and to appoint as lead plaintiff the member or members of the purported plaintiff class who are *"most* capable of representing the interests of the class members." 15 U.S.C. § 78u–4(a)(3)(B)(i) (emphasis added). The relatively small interest Guinn, Eisenberg and the Smiths have in the instant litigation could cause their interests to diverge from those of the class and the other Proposed Lead Plaintiffs as the instant case progresses.

While the PSLRA does not set an outside limit on the appointment of lead plaintiffs, the rule of reason, *see Chill,* 181 F.R.D. at 409, dictates Guinn, Eisenberg and the Smiths should not be appointed in the instant case. Accordingly, the Lead Plaintiffs motion is granted to the extent it seeks the appointment of Frank, Glogower, Pradeep, Laser and Jeffrey. The Lead Plaintiffs Motion is denied to the extent it seeks the appointment of Guinn, Eisenberg and the Smiths.

### C. *Appointment of Lead Counsel*

The approval of lead counsel pursuant to Section 21D(a)(3)(B)(v) is not governed by the same statutory guidelines which control the lead plaintiff determination. *See In re Milestone Scientific Sec. Litig.,* 187 F.R.D. 165, 176 (D.N.J. March 25, 1999) (*"Milestone II "*); *Cendant,* 182 F.R.D. at 149 (stating lead plaintiff does not come "inextricably tied to its counsel"). The decision to approve counsel selected by the lead plaintiff is a matter within the discretion of the district court. *See id.* The legislative history of the PSLRA reveals that Congress wished to encourage the exercise of discretion in approving the selection of lead counsel.

> [Congress] does not intend to disturb the court's discretion under existing law to approve or disapprove the lead plaintiff's choice of counsel when necessary to protect the interests of the plaintiff class.

Conference Report at 690–91. The exercise of such discretion necessitates an inquiry into

the appropriateness of the appointment of more than one law firm; the nature and extent of such inquiry may vary from case to case.

 The judgment of a lead plaintiff or proposed lead counsel is not dispositive in the appointment of lead counsel. Approval of lead counsel necessarily requires an independent evaluation of, among other considerations, the effectiveness of proposed class counsel to ensure the protection of the class. *See Milestone II*, 187 F.R.D. at 176. As well, a court must be mindful that the lead plaintiff has significant responsibilities and duties, including the management of the direction of the case. *See id.* Disputes concerning the direction of the case should be resolved by the lead plaintiff. This task can be complicated, or even thwarted, by pressure or input from several lead counsel. *See id.*

The PSLRA, however, does not expressly prohibit the lead plaintiff from selecting more than one law firm to represent the class. *See* 15 U.S.C. § 78u–4(a)(3); *see also Oxford*, 182 F.R.D. at 50; *Zuckerman v. Foxmeyer Health Corp.*, 1997 WL 314422 at *2 (N.D.Tex. 28 Mar. 1997). In certain situations, the appointment of multiple lead counsel may better protect the interests of the plaintiff class. Where a single firm lacks the resources or expertise to prosecute an action, for example, the approval of multiple lead counsel may expedite litigation. *See Oxford*, 182 F.R.D. at 49 (where proposed law firms were small and litigation was potentially "costly and time-consuming," the "sharing of resources and experience" would ensure a more expeditious resolution of the action); *In re Wells Fargo Sec. Litig.*, 156 F.R.D. 223, 226 (N.D.Cal.1994)("[The] plaintiff law firms, which usually take cases on a contingent fee basis, join together to prosecute major complex cases because doing so allows them to leverage their resources and spread the risks of unfavorable outcomes."); *but see Milestone II*, 187 F.R.D. at 176 (citing *Amicus* Brief submitted by the SEC, at 9 & n.4 (observing the approval of multiple lead counsel may engender inefficiency in class action litigation)).

The potential for duplicative services and the concomitant increase in attorneys' fees work against the approval of more than one law firm, especially in cases in which one law firm has the proven ability to adequately manage and litigate securities class actions. *See Milestone II*, 187 F.R.D. at 176; *Chill*, 181 F.R.D. at 413 (the structure of proposed leadership should not be "too distended to efficiently manage the prosecution of th[e] action"); *Reiger v. Altris Software, Inc.*, 1998 U.S. Dist. LEXIS 14705, at *15–16, *18 (S.D.Cal. 11 Sept. 1998)(observing the enlargement of the number of lead counsel may "unnecessarily increase the time and expense spent on preparing and litigating the case"); *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 491 (W.D.Mich.1994)(quoting Manual for Complex Litigation 2nd § 20.22 at 16)(stating " 'the number [of lead counsel] should not be so large as to hamper the unity of direction that is needed' ").

The limitation in the PSLRA of total attorneys' fees to "a reasonable percentage of the amount of damages and prejudgment interest actually paid to the class," *see* 15 U.S.C. § 78u–4(a)(6), does nothing to increase, much less regulate, the efficiency of multiple counsel. This provision neither guarantees the reasonableness of fees nor the non-duplication of services. *See Milestone II*, 187 F.R.D. at 176–177.

It appears, moreover, "a court's expertise is rarely at its most formidable in the evaluation of counsel fees." *Cendant*, 182 F.R.D. at 150; *see also Milestone II*, 187 F.R.D. at 176–177; *Raftery v. Mercury Finance Co.*, No. 97–624, 1997 WL 529553 at *2 (N.D.Ill. August 15, 1997)("[T]hat the court will be able to divine the reasonable value of the services rendered [by attorneys] when the time comes [is] a false proposition."); *but see Oxford*, 182 F.R.D. at 50 (appointment of co-lead counsel contingent on the non-duplication of attorneys' fees); *Lax*, 1997 WL 461036 at * 7 (appointing two law firms as co-lead counsel "provided that there is no duplication of attorneys' services, and the use of co-lead counsel does not in any way increase attorneys' fees and expenses"); *Nager v. Websecure, Inc.*, 1997 WL 773717 at *1 (D.Mass. 26 Nov. 1997).

It is not possible, during the preliminary stages of litigation, to evaluate the potential

of, much more guarantee, the non-duplication of services or the reasonableness of attorneys' fees during the course of the prosecution of the action. It is, however, possible at the outset of the litigation, to structure lead counsel so as to avoid the inevitable inefficiency and expense resulting from an inappropriate multiple lead counsel arrangement.

■■ Additionally, where more than one lead counsel are appointed, there is the potential they may ultimately seize control of the litigation, an occurrence the PSLRA intended to foreclose. As discussed, the PSLRA was designed, in part, to effectuate the transfer of control of securities class actions from the lawyers to the investors. *See* Conference Report at 685. Accordingly, those seeking the appointment of more than one law firm must demonstrate the lead plaintiff will be able to withstand any limitation on, or usurpation of, control, and effectively supervise the law firms acting as lead counsel. *See Milestone II,* 187 F.R.D. at 176–177.

■■ The selection of counsel by a lead plaintiff also must be the product of independent, arms length negotiations. This Circuit has observed: "[T]he lead attorney position is coveted as it is likely to bring its occupant the largest share of the fees generated by the litigation." *Garr v. U.S. Healthcare, Inc.,* 22 F.3d 1274, 1277 (3d Cir.1994); *see also Milestone II,* 187 F.R.D. at 177–178. Consequently, there arises the possibility that several law firms may exert pressure on the lead plaintiff. In *Raftery,* the court expressed concern about a retainer agreement between the proposed lead plaintiff and a law firm where there appeared the possibility of an early settlement. 1997 WL 529553, at *2. The court suspected the cap of thirty-three and one-third percent on the retainer agreement was "not the result of hard bargaining." *Id.* It was observed that a reasonable fee is the lowest fee "that would be paid by a discerning client in an arms length negotiation." *Id.*

Not only should the proposed counsel fees be the result of hard-bargaining, but the initial selection of counsel should also be the result of independent decision-making by the lead plaintiff. In *Milestone II,* it was ob-

served " 'unless there has been active, effective client participation in the [selection] process, it is possible that the counsel arrangement may simply reflect bargaining among lawyers for their own stake in the case, and not serve the best interests of the class.' " *Id.,* 1999 WL 297019 at *12 (quoting *Amicus* Brief submitted by the SEC at 21–22).

In the instant case, Proposed Lead Plaintiffs designated Milberg Weiss to serve as Lead Counsel for the Class. *See* Moving Brief at 12. In addition, Proposed Lead Plaintiffs designated Cohn Lifland to serve as liaison counsel. Neither the Moving Brief nor the proposed order submitted for the appointment of lead plaintiffs and the selection of lead and liaison counsel sets forth the *proposed duties or functions of the proposed firms.*

As stated, counsel for the Class is chosen by the lead plaintiff, subject to the approval of the court. *See* 15 U.S.C. § 78u–4(a)(3)(B)(v). Proposed Lead Plaintiffs have selected Milberg Weiss to serve as Lead Counsel. Milberg Weiss has had significant experience in the litigation of securities class actions in this and other courts. *See, e.g., Greebel,* 939 F.Supp. at 64 ("[T]he court concludes ... that, in light of the conceded expertise of Milberg Weiss ... in securities actions, the court should approve Movants' selection of that firm as lead counsel."). There has been no objection raised to the appointment of Milberg Weiss to serve as lead counsel, and it appears Milberg Weiss is capable of representing the Class in this action. *See* Firm Resume, attached to Weiss Aff. as Exh. D. Accordingly, the selection of Milberg Weiss as lead counsel is approved.

As stated, Proposed Lead Plaintiffs also seek approval of Cohn Lifland to serve as liaison counsel, but do not set forth the role Cohn Lifland will play if approved to serve in that capacity. It appears the responsibilities of liaison counsel typically involve "advising lead counsel on local procedural matters, coordinating administrative matters, distributing communications between the Court and other counsel, convening meetings of counsel and advising parties of developments in the

**224**

case." *Cendant,* 182 F.R.D. at 152; *see also Oxford,* 182 F.R.D. at 50 (liaison counsel would be charged with "administering communications between the Court and counsel ..., keeping counsel apprised of developments in the case and scheduling matters, and generally assisting in coordination"); *Chill,* 181 F.R.D. at 413 n. 13 (liaison counsel is ordinarily charged with administrative duties).

The *Cendant* court observed "[q]ualified lead counsel will be surely capable of performing these ministerial tasks.... Accordingly, all motions for appointment of liaison counsel are denied." *See id.,* 182 F.R.D. at 152. In the instant case, Proposed Lead Plaintiffs have not offered any explanation as to what duties would be assumed by Cohn Lifland and why such duties could not be adequately performed by lead counsel. Further, it has not been demonstrated how the duties of the liaison counsel would not be coextensive with those of the lead counsel.

As mentioned, Milberg Weiss is a law firm with extensive experience in the litigation of securities class actions. *See* Firm Resume, attached to Weiss Aff. as Exh. D. There is nothing to suggest Milberg Weiss would not be capable of handling the administrative tasks presented by the litigation of the instant matter. The instant matter appears to allege a cause of action with clearly defined boundaries. Further, the potential class size and possible damages does not appear to warrant the approval of liaison counsel. Milberg Weiss may, however, in its capacity as lead counsel, distribute non-duplicative work assignments to non-lead counsel so as to facilitate the orderly and efficient prosecution of the instant action. *See Milestone II,* 187 F.R.D. at 180–181; *In re Wells Fargo Sec. Litig.,* 156 F.R.D. at 227 (appointing a single lead counsel but stating the firm may "farm[ ] out work on the case to another law firm because of specialized knowledge, geographic proximity to witnesses or evidence or other comparative advantages, or even to spread risk"); *Malin v. Ivax Corp.,* docket No. 96–1843, Order at p. 8 (S.D.Fla. Nov. 1, 1996) (urging the utilization of other firms retained in the action by other plaintiffs).

 There has been no compelling reason presented in the instant case for the appointment of liaison counsel.[13] The Lead Counsel Motion is granted to the extent Proposed Lead Plaintiffs sought approval of the selection of Milberg Weiss as lead counsel; the request for approval of the selection of Cohn Lifland as liaison counsel is denied.

*Conclusion*

For the foregoing reasons, the Lead Plaintiffs Motion is granted in part and denied in part; the Lead Counsel Motion is granted in part, and denied in part.

---

**13.** It is recognized that Milberg Weiss, pursuant to Rule 101.1(c) of the Local Rules of Civil Procedure, must select local counsel. This, however, does not support the need for the formal approval of liaison counsel in the instant case.