**In re LUCENT TECHNOLOGIES, INC. SECURITIES LITIGATION.**

**No. 2:00CV00621.**

United States District Court,
D. New Jersey.

April 19, 2001.

David J. Bershad, Jerome M. Congress, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City, Max W. Berger, Steven B. Singer, Bernstein, Litowitz, Berger & Grossman, LLP, New York City, Steven J. Toll, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC, Gary S. Graifman, Robert Wilkins, Kantrowitz, Goldhamer & Graifman, Montvale, NJ, Thomas G. Shapiro, Theodore M. Hess–Mahan, Shapiro, Haber & Urmy, LLP, Boston, MA, William J. Pinilis, Kaplan, Kilsheimer & Fox, LLP, Morristown, NJ, Robert A. Hoffman, Samuel R. Simon, Barrack, Rods & Bacine, Haddonfield, NJ, Daniel E. Bacine, Barrack, Rodos & Bacine, Philadelphia, PA, Sandy Liebhard, Bernstein, Liebhard & Lifshitz, LLP, New York City, Robert Berg, Mel E. Lifshitz, Bernstein, Liebhard & Lifshitz, LLP, Fort Lee, NJ, Brian Felgoise, Offices of Brian Felgoise, Philadelphia, PA, Peter Fishbein, Law Offices of Peter Fishbein, Hasbrouck Heights, NJ, Harvey Greenfield, Law Offices of Harvey Greenfield, New York City, Allyn Z. Lite, Joseph J. DePalma, Lite, DePalma, Greenberg & Rivas, LLC, Newark, NJ, Charles J. Piven, Law Offices of Charles J. Piven, Baltimore, MD, Joseph E. Saul, Gellerstein & Saul, Teaneck, NJ, Stuart Wechsler, Samuel K. Rosen, Wech-

sler, Harwood, Halebian & Feffer, New York City, Fred T. Isquith, Michael Jaffe, Wolf, Haldenstein, Adler, Freeman & Herz, New York City. Andrew M. Schatz, Jeffrey S. Nobel, Schatz & Nobel, P.C., Hartford, CT, Paul Geller, Jonathan M. Stein, Shepard & Geller, Boca Raton, FL, James V. Bashian, Law Offices of James V. Bashian, New York City, Mark Topaz, Julie Kamens, Schiffrin & Barroway, Ltd., Bala Cynwyd, PA, David B. Kahn, David B. Kahn & Associates, Northfield, IL, Curtis V. Trinko, Offices of Curtis V. Trinko, LLP, New York City, Brian Barry, Law Offices of Brian Barry, Los Angeles, CA, Jules Brody, Stull, Stull & Brody, New York City, Peter D. Bull, Joshua M. Lifshitz, Bull & Lifshitz, LLP, New York City, Joseph H. Weiss, Weiss & Yourman, New York City, Dennis J. Johnson, Law Offices of Dennis J. Johnson, South Burlington, VT, Jeffrey H. Squire, Kirby, McInerney & Squire, LLP, New York City, Deborah Gross, Offices of Bernard M. Gross, P.C., Philadelphia, PA, Klari Neuwelt, Law Offices of Klari Neuwelt, New York City, Paul Geller, Cauley & Geller, LLP, Boca Raton, FL, Andrew G. Tolan, Pomerantz, Haudek, Block, Grossman & Gross LLP, New York City, Karl J. Stoecker, Office of Karl J. Stoecker, New York City, Counsel for Plaintiffs.

Paul C. Saunders, Robert H. Baron, Ilana B. Chill, Cravath, Swaine & Moore, New York City, John H. Schmidt, Jr., Lindabury, McCormick & Estabrook, Westfield, NJ, Counsel for Defendants.

LECHNER, District Judge.

This consolidated action, and several recently filed actions, were brought on behalf of purchasers of Lucent Technologies, Inc. ("Lucent") common stock ("Lucent Stock"). These suits seek damages for violations of Sections 10(b) ("Section 10(b)") and 20(a) ("Section 20(a)") of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10–b ("Rule 10–b") promulgated thereunder, 17 C.F.R. § 240.10b–5.

On 26 December 2000, a consolidation order was entered (the "26 December 2000 Consolidation Order"); this order consolidated the original action with several subsequently filed actions. Currently pending is a motion to vacate (the "Motion to Vacate")[1] the 26 December 2000 Consolidation Order, as well as several lead plaintiff and lead counsel motions submitted in connection with the recently filed actions.

For the reasons explained below, the Motion to Vacate is denied and the lead plaintiff and lead counsel motions are granted in part and denied in part.

*Facts*

A. *Procedural History*

Between 7 January 2000 and 2 March 2000, eighteen class action complaints were filed against Lucent, Richard A. McGinn ("McGinn") and Donald K. Peterson ("Peterson").[2] On 25 February 2000 and 16 March 2000, orders were entered consolidating the *Lucent I* actions.

---

1. The Motion to Vacate was made by way of two letters to the Court. By letter, dated 4 January 2001, Steven J. Toll, counsel for plaintiff Jeffrey Marks, requested that the 26 December Consolidation Order be vacated (the "4 January 2001 Toll Letter"). 4 January 2001 Toll Letter at 1. By letter, dated 4 January 2001, Max W. Berger, counsel for plaintiffs the Anchorage Police & Fire Retirement

System and the Louisiana School Employees' Retirement System, also requested that the 26 December 2000 Consolidation Order be vacated (the "4 January 2001 Berger Letter"). 4 January 2001 Berger Letter at 1–2.

2. The complaints filed between 7 January 2000 and 2 March 2000 are collectively referred to as *"Lucent I "*.

The Lucent I complaints primarily alleged that various press releases and statements to analysts issued by Lucent in the fall of 1999 were false and misleading because Lucent knew or should have known that its projections for revenue and earnings growth were unattainable. More precisely, the Lucent I complaints alleged that Lucent was experiencing severe internal problems including declining demand and margins and escalating costs. It was alleged that Lucent tried to mask those problems through various "accounting gimmicks" and an internal plan for reorganization. It was also alleged that Lucent's public statements were "unrealistically positive." As a consequence, Lucent Stock was caused to trade at artificially high prices. The proposed class was alleged to include all persons who purchased Lucent Stock between 27 October 1999[3] and 6 January 2000.

By order, dated 27 April 2000, (the "27 April Order") the Employer–Teamsters Locals 175 & 505 Pension Trust Fund (the "Pension Trust Fund") was appointed provisional lead plaintiff. 27 April Order. Thereafter, a sealed bid auction was held and the firm of Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss") was selected as lead counsel.

On 3 November 2000, the Pension Trust Fund filed a consolidated and amended class action complaint (the "First Consolidated and Amended Complaint"), alleging a class period from 26 October 1999 through 6 January 2000. The allegations in the First Consolidated and Amended Complaint were more detailed than the allegations in the original complaints. For example, the First Consolidated and Amended Complaint alleged that Lucent had recognized revenue improperly and in

violation of Generally Accepted Accounting Principles. First Consolidated and Amended Complaint at ¶¶ 87–91. Except for the unspecific reference to "accounting gimmickry," *see* Complaint filed in *Elan v. Lucent*, No. 00–621, at ¶ 21, there were no allegations in the original complaints concerning accounting irregularities.

On 21 November 2000, Lucent issued a press release (the "21 November 2000 Press Release") announcing that it had improperly recognized approximately $125 million in revenue during the fourth quarter of 2000. Lucent also announced in the 21 November 2000 Press Release that it had reported the revenue recognition issue to the Securities and Exchange Commission (the "SEC").

In the wake of the 21 November 2000 Press Release, a number of other class action complaints were filed against Lucent, McGinn, Henry B. Schacht ("Schacht") and Deborah C. Hopkins ("Hopkins").[4] All such complaints were based on the 21 November 2000 Press Release.

On 22 November 2000, the Pension Trust Fund filed a second consolidated and amended class action complaint (the "Second Consolidated and Amended Complaint"). The Second Consolidated and Amended Complaint extended the class period through 10 October 2000.

On 1 December 2000, the Pension Trust Fund filed a third consolidated and amended class action complaint (the "Third Consolidated and Amended Complaint"). The class period alleged in the Third Consolidated and Amended Complaint was further extended to include the period from 26 October 1999 through 21 November 2000.

---

**3.** A few of the *Lucent I* complaints alleged a class period commencing on 26 October 1999.

**4.** The suits filed after the 21 November 2000 Press Release are collectively referred to as *"Lucent II "*.

On 21 December 2000, Lucent issued a press release (the "21 December 2000 Press Release") announcing it would reduce fourth quarter 2000 revenue by an additional $700 million. As was the case after the 21 November 2000 Press release, several additional class action complaints were filed following the 21 December 2000 Press Release.

On 4 January 2001, the Pension Trust Fund filed a fourth consolidated and amended class action complaint (the "Fourth Consolidated and Amended Complaint"). The class period alleged in the Fourth Consolidated and Amended Complaint was further extended to include the period from 26 October 1999 through 21 December 2000.

As mentioned, on 26 December 2000, an order was entered consolidating the *Lucent II* complaints with *Lucent I* action. Thereafter, on 23 January 2001, defendants Lucent, McGinn and Peterson filed an answer to the Fourth Amended and Consolidated Complaint.[5]

On 26 January 2001, a conference was held (the "26 January 2001 Conference") to discuss the propriety vacating the 26 December 2000 Consolidation Order. At the 26 January 2001 Conference, the parties were invited to brief the issue of consolidation.[6] Thereafter, on 9 March 2001, oral argument was conducted.

### B. Arguments

#### 1. Lucent I Plaintiffs

The Lucent I Plaintiffs argue that this matter should proceed as a single consolidated action, under a single leadership structure. 13 February 2001 *Lucent I* Brief at 1. As mentioned, the Lucent II actions predominately focus on revenue recognition improprieties in Lucent's financial statements for the fourth quarter of fiscal 2000. The Lucent I Plaintiffs contend that claims of improper revenue recognition practices for the entire fiscal 2000 year have been pleaded in the Fourth Amended and Consolidated Complaint. *Id.* In addition, the Lucent I Plaintiffs argue that before any of the Lucent II actions were filed, the Lucent I Plaintiffs had already alleged in the operative pleadings that Lucent was engaging in the same revenue recognition improprieties now alleged in the Lucent II cases. *Id.*

The Lucent I Plaintiffs also assert that the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. ¶ 78u–4 *et seq.*, does not require solicitation of new lead plaintiff applications merely because improper revenue recognition and additional interrelated wrongdoing came to light and was included in a series of amended complaints. 13 February 2001 *Lucent I* Brief at 2. The Lucent I Plaintiffs argue that such amendments were the outgrowth of an investigation by Lead Coun-

---

**5.** The parties are separated into three groups: (1) the *"Lucent I* Plaintiffs"; (2) the *"Lucent II* Plaintiffs"; and (3) the "Defendants."

**6.** In support of the Motion to Vacate, the Lucent II Plaintiffs submitted the following: (1) a brief dated 13 February 2001 (the "13 February 2001 *Lucent II* Brief"); (2) a brief dated 12 March 2001 (the "12 March 2001 *Lucent II* Brief"); and (3) a brief dated 19 March 2001 (the "19 March 2001 *Lucent II* Brief").

In opposition to the Motion to Vacate, the Lucent I Plaintiffs submitted the following: (1) a brief dated 13 February 2001 (the "13 February 2001 *Lucent I* Brief"); (2) a brief dated 12 March 2001 (the "12 March 2001 *Lucent I* Brief"); and (3) a brief dated 19 March 2001 (the "19 March 2001 *Lucent I* Brief").

In opposition to the Motion to Vacate, Defendants submitted the following: (1) a brief dated 13 February 2001 (the "13 February 2001 Defendant Brief"); (2) a brief dated 12 March 2001 (the "12 March 2001 Defendant Brief"); and (3) a brief dated 19 March 2001 (the "19 March 2001 Defendant Brief").

sel which revealed that improper accounting was used to cover up serious problems at Lucent and constituted an integral aspect of the scheme through which defendants accomplished the deception alleged in the original complaint. *Id.*

The Lucent I Plaintiffs also contend that the expansion of the class period does not require a new notice to the proposed class. *Id.* The Lucent I Plaintiffs argue that the same types of deception which occurred during the initial class period continued until December 2000. *Id.* The Lucent I Plaintiffs assert that the class period was properly extended without an additional notice to cover all persons who were injured by that continuing course of conduct. *Id.*

The Lucent I Plaintiffs argue, moreover, that a subclass is not necessary to protect the interests of the Lucent II Plaintiffs. 12 March 2001 Lead Plaintiff Brief at 1. If, however, a Lucent II subclass is created, the Lucent I Plaintiffs assert that the subclass should begin no earlier than 10 October 2000.[7] *Id.* Likewise, if it is decided that consolidation is not appropriate, and that Lucent II should proceed separately, the Lucent I Plaintiffs assert that the class period in Lucent II should begin no earlier than 10 October 2000. 13 February 2001 Lead Plaintiff Brief at 3–4.

### 2. *Lucent II Plaintiffs*

The Lucent II Plaintiffs assert that there is no significant connection between Lucent I and Lucent II. 13 February *Lucent II* Brief at 3. The Lucent II Plaintiffs contend that "the claims asserted in Lucent II are significantly stronger than the claims alleged in Lucent I and, if the two cases were to be tried together, the strength of the Lucent II claims would be diminished by the weakness of the earlier Lucent I claims." *Id.* at 16. The Lucent II Plaintiffs contend that Lucent II should be a separate case with class period of 20 July 2000[8] through 20 December 2000. *Id.* at 1.

The Lucent II Plaintiffs assert that Lucent I, as originally filed, was a projections case that concerned allegedly false statements Lucent made about growth, demand and production problems. *Id.* According to the Lucent II Plaintiffs, the gravamen of Lucent I was that, during the period of 27 October 1999 through 6 January 2000, defendants "brought about an unrealistically positive assessment of Lucent and its business, prospects and operations." *Id.* (quoting 2 June 2000 Notice of Pendency, published in the *Wall Street Journal* by Milberg Weiss). The Lucent II Plaintiffs further assert that Lucent I did not concern any allegations of improper revenue recognition, but rather, that Lucent had made false and misleading statements regarding the "deteriorating financial condition of the company, the lack of demand for the products of the company, [and] the inability of the company to control costs and maintain profit margins." 13 February *Lucent II* Brief at 3–4 (quoting the initial complaint filed by Milberg Weiss in *Kaufman v. Lucent Technologies*, No. 00–156).

The Lucent II Plaintiffs further argue that Lucent II "relates solely to admitted accounting improprieties that occurred only during Lucent's fiscal 2000 fourth quarter ended 30 September 2000, and false statements regarding those false quarterly results."[9] 13 February *Lucent*

---

7. 10 October 2000 is the date upon which Lucent made its first public statement with regard to actual fourth quarter results.

8. The Lucent II Plaintiffs assert that the Lucent II class period begins on 20 July 2000. 13 February 2001 *Lucent II* Brief at 5 n. 4. On that date, Lucent announced its expected financial results for the fiscal 2000 fourth quarter. *Id.*

9. As mentioned, Lucent announced in the 21 November 2000 Press Release that it had discovered a revenue recognition issue which it had called to the attention of the SEC. *Id.*

*II* Brief at 4. Moreover, two of the defendants in *Lucent II*, Hopkins and Schacht, were not named as defendants in Lucent I. *Id.* The Lucent II Plaintiffs contend, therefore, that Lucent I and Lucent II involve "different allegations, different class periods and different defendants." *Id.* at 7. The Lucent II Plaintiffs argue that the Lucent I and Lucent II actions should not have been consolidated. *Id.*

The Lucent II Plaintiffs assert that if the *Lucent I* and Lucent II cases remain consolidated, a subclass should be created. *Id.* at 16. According to the Lucent II Plaintiffs, any subclass should commence on 20 July 2000.[10] *Id.* at 16. Moreover, the Lucent II Plaintiffs assert that a separate Lead Plaintiff and Lead Counsel should be appointed to represent a Lucent II subclass. *Id.* at 1.

In the alternative, the Lucent II Plaintiffs argue that the parties should be directed to file a new notice of pendency, and appoint new lead plaintiffs and new lead counsel. *Id.* at 17. The Lucent II Plaintiffs argue that "[t]o allow Milberg Weiss to file a complaint which extends the *Lucent I* class period by one year and effectively subsumes the claims asserted in Lucent II would eviscerate the protections afforded investors by the notice and lead plaintiff provisions of the PSLRA." *Id.* at 7. *Id.* at 17.

### 3. *Defendants*

The Defendants assert that the *Lucent I* and Lucent II matters should remain consolidated. 13 February 2001 Defendant Brief at 6. According to the Defendants, to the extent that the Lucent II complaints allege improper revenue recognition by Lucent (which was revealed in the 21 November 2000 Press Release and the 21 December 2000 Press Release), those alle-

gations are essentially the same as the allegations with respect to those issues in the Fourth Amended Complaint. *Id.* The Defendants further contend that if there were to be two separate trials, there would be an of overlap in the evidence. *Id.* at 9. The Defendants, moreover, contend that, unless the two trials could be separated with "surgical precision," there may be difficult matters concerning issue preclusion to resolve, depending on the order of the trials. *Id.* at 1, 8. Finally, the Defendants state that they will not be prejudiced by consolidation. *Id.* at 9. According to the Defendants, "consolidation offers the best chance to bring the allegations to a prompt early trial, a result that defendants desire." *Id.* at 9.

The Defendants believe that the notices already published in this litigation satisfy the purposes of the PSLRA. *Id.* at 14. Various notices have been filed in the *Lucent I* and Lucent II matters, including several notices filed in January 2000, the 2 June 2000 Notice of Pendency and notices filed in connection with the Lucent II complaints. In addition, Defendants assert that there has been an "overwhelming amount of press coverage" regarding this case. *Id.* at 14–15. The Defendants, therefore, contend that "[i]t is highly unlikely that any person or entity that would seek to become lead plaintiff does not already know about the existence of this case." *Id.*

Defendants further argue that subclasses are not necessary to protect the interests of the Lucent II Plaintiffs. 12 March 2001 Defendant Brief at 1. According to the Defendants, the fact that the Lucent I and Lucent II complaints allege different (but overlapping) class periods does not, on it own, create a conflict. *Id.* at 7.

---

10. As mentioned, the Lucent II Plaintiffs assert that the Lucent II class period begins on 20 July 2000. 13 February 2001 *Lucent II* Brief at 5 n.4. On that date, Lucent announced its expected financial results for the fiscal 2000 fourth quarter. *Id.*

Moreover, the Defendants argue that a conflict cannot be premised on the assertion by counsel for the Lucent II Plaintiffs that the allegations in Lucent I are "weaker" than the allegations in Lucent II. *Id.* at 10. Finally, the Defendants contend, without explanation, that the creation of a subclass would "inevitably increase inefficiencies." *Id.* at 7.

*Discussion*

A. *Consolidation*

As mentioned, the *Lucent II* Plaintiffs are presently seeking to vacate the 26 December 2000 Consolidation Order. Rule 42(a) of the Federal Rules of Civil Procedure ("Rule 42(a)") provides:

> When actions involving common questions of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

Fed.R.Civ.P. 42(a); *see also Nanavati v. Burdette Tomlin Memorial Hosp.*, 857 F.2d 96, 103 n. 3 (3d Cir.1988) (consolidation is appropriate where there are actions involving common questions of law or fact); *Fields v. Biomatrix, Inc.*, 198 F.R.D. 451, 454 (D.N.J.2000) (same) (citations omitted); *Liberty Lincoln Mercury, Inc. v. Ford Marketing Corp.*, 149 F.R.D. 65, 80 (D.N.J.1993) ("Rule 42(a) gives the [D]istrict [C]ourt 'broad powers to consolidate actions involving common questions of law or fact if, in its discretion, such consolidation would facilitate the administration of justice.'"). The PSLRA, moreover, directs that cases should be consolidated where there is "more than one action on behalf of a class asserting substantially the same claim or claims." 15 U.S.C. § 78u-4(a)(3)(B)(ii).

■ The decision as to whether consolidation is appropriate embraces concerns of judicial economy, as well as judicial discretion. *Weltz v. Lee*, 199 F.R.D. 129, 131 (S.D.N.Y.2001) (citing *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284–85 (2d Cir. 1990)); *Vincelli v. National Home Health Care Corp.*, 112 F.Supp.2d 1309, 1312 (M.D.Fla.2000) (citation omitted); *In re Olsten Corp. Sec. Litig.*, 3 F.Supp.2d 286, 292 (E.D.N.Y.1998); *see also Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 353, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983) (The "burdens of multiple lawsuits may be avoided [by consolidation]").

■ Neither the PSLRA nor Rule 42 requires that pending suits be identical before they can be consolidated. Rather, in deciding whether to consolidate actions under Rule 42(a), it must be considered

> whether the specific risks of prejudice and possible confusion [are] overborne by the risk of inconsistent adjudications of common factual and legal issues, the burden on the parties, witnesses, lawsuits, the length of time required to conclude multiple lawsuits as against a single one, and the relative expense to all concerned of the single-trial, multiple-trial alternatives.

*In re Consolidated Parlodel Litig.*, 182 F.R.D. 441, 444 (D.N.J.1998) (citations omitted); *Chill v. Green Tree Financial Corp.*, 181 F.R.D. 398, 405 (D.Minn.1998) (citations omitted); *see also Takeda v. Turbodyne Technologies, Inc.*, 67 F.Supp.2d 1129, 1133 (C.D.Ca.1999) ("[A] court must balance the savings of time and effort consolidation will produce against any inconvenience, delay, confusion, or prejudice that may result."). In the absence of an articulated basis to assert confusion or prejudice, consolidation is generally appropriate.

The court in *In re Olsten* was presented with facts similar to those in the present matter. There, a plaintiff filed a complaint in June 1997; that plaintiff was subse-

quently appointed as lead plaintiff and the Milberg Weiss firm was selected as lead counsel. *In re Olsten*, 3 F.Supp.2d at 287. In August and September 1997, three additional complaints were filed. *Id.* at 288–90. All of the complaints alleged violations of §§ 10(b) and 20(a) of the Exchange Act and Rule 10b–5. *Id.* at 292. However, the detail of the allegations in the original complaint were somewhat different from those in the later complaints. *Id.* at 293.

The first case focused on misrepresentations regarding margins and certain transactions by the defendant; the new cases focused on fraudulent Medicare billing. *Id.* The cases also alleged different class periods. The alleged class period in the three later cases began a couple of months before and ended several months after the class period in the original complaint. *Id.*

As in the present matter, a dispute developed between the plaintiff in the original case and the plaintiffs in the later cases, who argued that the claims were different. *Id.* It was found that consolidation of all four actions was appropriate.

> Each complaint involve[d] claims asserted under Section 10(b) and 20(a) of the [Exchange Act]. More importantly, each action allege[d] that Olsten concealed information regarding its business practices, which involved Medicare billing. Essentially, all four actions [were] characterized as failure to disclose to shareholders actions.... [The] difference[s][did] not prevent consolidation since the underlying facts [were] the same.

*Id.* at 292–93.

■ In the pending situation, it appears that the various complaints involve common questions of fact and law. Each of the complaints at issue alleges violations of Sections 10(b) and 20(a) of the Exchange Act and Section 10b–5. Moreover, to the extent that the *Lucent II* complaints allege improper revenue recognition by Lucent,

those allegations are essentially the same as the allegations with respect to those issues in the Fourth Amended and Consolidated Complaint. *See* Fourth Consolidated and Amended Complaint at ¶¶ 10, 94, 103, 104, 212.

While some of the details of the allegations in the Lucent II complaints differ from those in the Fourth Amended and Consolidated Complaint, the complaints all make the same basic claims with regard to Lucent's fiscal fourth quarter 2000 results. For example, both the Fourth Amended and Consolidated Complaint and the Lucent II complaints allege that the guidance Lucent disseminated in the summer and fall of 2000 regarding its expected fourth quarter results was overly optimistic and materially misleading. *Compare* Fourth Amended and Consolidated Complaint at ¶¶ 197–214 *with* Complaint in *Abowitz v. Lucent,* No. 00–6123, at ¶¶ 38–53. Moreover, both the Fourth Amended Complaint and the *Lucent II* complaints allege that the truth was revealed to the market in the 21 November 2000 and the 21 December 2000 Press Releases. *Id.*

As mentioned, the Lucent II Plaintiffs argue that Lucent I and Lucent II do not contain common issues of fact and law because "Lucent I [is] ... a projections case that concern[s] allegedly false statements Lucent made about growth, demand and production problems," while "Lucent II relates to admitted accounting improprieties that occurred only during Lucent's fourth quarter." 13 February *Lucent II* Brief at 3, 16.

As discussed, both cases appear to concern Lucent's projections for fiscal 2000, as well as the revisions to its actual financial results for the fourth fiscal quarter. The Lucent I Plaintiffs contend that, beginning in October 1999, Lucent misled the market regarding its prospects for fiscal 2000 and repeatedly reduced its guidance through-

out fiscal 2000. *See generally* Fourth Amended and Consolidated Complaint. The Lucent II complaints similarly allege a series of misrepresentations regarding Lucent's projected results for fiscal 2000, except they allege that the course of conduct began in July 2000 rather than October 1999. *See generally Harris v. Lucent,* No. 00–6295. Moreover, with regard to the overlapping time periods (*i.e.,* 20 July 2000 through 21 December 2000), the Lucent I and Lucent II Plaintiffs' allegations are substantially (although not exactly) the same.[11]

It appears that consolidation of the Lucent I and Lucent II actions will benefit all concerned. At the present time, the risks of prejudice or possible confusion appear to be "overborne by the risk of inconsistent adjudications of common factual and legal issues." *In re Consolidated Parlodel,* 182 F.R.D. at 444. Moreover, the burden on the parties and witnesses, the time required to conclude multiple lawsuits and the relative expense of maintaining multiple lawsuits, counsel against severance. *See id.* Indeed, consolidation will expedite pretrial proceedings, reduce, if not eliminate, the duplication of discovery, and reduce costs. *See id.* Therefore, in the interests of economy and efficiency, the Lucent I and Lucent II actions will remain consolidated.[12] Nevertheless, if the discovery process reveals a substantial reason why the actions should not be consolidated for the purpose of trial, this decision can be revisited.

### B. *Subclasses*

As mentioned, the Lucent II Plaintiffs assert that, if this matter remains consolidated, a subclass should be created to represent the Lucent II Plaintiffs. 13 February 2001 *Lucent II* Brief at 16. The Lucent II Plaintiffs assert that there is a conflict between the *Lucent I* and Lucent II actions. *Id.* In addition, the Lucent II Plaintiffs contend that there will be a "substantial risk of confusion" if consolidation is ordered without a Lucent II subclass. *Id.* at 17.

As discussed, the Lucent II Plaintiffs argue that the "claims asserted in Lucent II are significantly stronger than the claims alleged in Lucent I, and if the two cases are tried together, the strength of the Lucent II claims will be diminished by the earlier claims." *Id.* The Lucent II Plaintiffs assert that Lucent I concerns many events which have no bearing on the issues relevant to Lucent II. *Id.* at 16–17. "For example, in Lucent I, plaintiffs allege that defendants, among other things, concealed (i) problems in Lucent's optical networking division; (ii) problems with Lucent's other products; and (iii) Lucent's 'inability to price competitively and lack of access to supplies of critical components.'" *Id.* at 17 (citing First Consolidated and

---

**11.** This is true not only with regard to the Fourth Amended and Consolidated Complaint, but also the Second Amended and Consolidated Complaint. The Second Amended and Consolidated Complaint, which expanded the alleged class period to end on 10 October 2000, was submitted to Defendants and the court in "proposed" form before the 21 November 2000 Press Release and the filing of the *Lucent II* complaints.

**12.** The following complaints against Lucent were not included in the 26 December 2000 Consolidation Order:

1. *Murphy v. Lucent,* No. 00–6111
2. *Abowitz v. Lucent,* No. 00–6123
3. *Sakal v. Lucent,* No. 00–6282
4. *Meyer v. Lucent,* No. 00–6285
5. *Harris v. Lucent,* No. 00–6295
6. *Raphael v. Lucent,* No. 01–255
7. *Parnassus Fund v. Lucent,* No. 01–304
8. *Feder v. Lucent,* No. 01–344
9. *Wizbicki v. Lucent,* No. 01–477
10. *Davis v. Lucent,* No. 01–796
11. *Riddle v. Lucent,* No. 01–952

Each of the above-referenced complaints will be consolidated with the instant action.

Amended Complaint at ¶¶ 51–77). According to the Lucent II Plaintiffs, none of these allegations is relevant to Lucent II, and only serve to weaken "the strong accounting fraud allegations that are the heart of Lucent II." 13 February 2001 *Lucent II* Brief at 17.

Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") permits courts to create subclasses "[w]hen appropriate." Fed.R.Civ.P. 23(c)(4)(B). In securities cases, subclasses are appropriate when plaintiffs "have a substantial antagonism toward the positions of other[s] in the class." *In re PHLCORP Sec. Litig.*, 1989 WL 251578, at *2 (S.D.N.Y.16 Nov.1989). However, such a conflict must be significant and preclude the lead plaintiff from adequately representing a single, consolidated class.

█ Presently, any asserted conflict between the Lucent I and Lucent II Plaintiffs is merely theoretical. Subclasses are not currently necessary. Indeed, the fact that the Lucent I and Lucent II complaints allege different (but overlapping) class periods does not, on its own, create a conflict. *See Chan v. Orthologic Corp.*, 1996 WL 1082812, at *3 (D.Ariz.19 Dec. 1996) (finding no conflict based on differing class periods because "[e]very class member shares on overriding common interest in establishing the existence and materiality of misrepresentations") (citation and internal quotations omitted).

At the present time, a conflict cannot be premised on the assertion by Lucent II counsel that the allegations in Lucent I are "weaker" than the allegations in Lucent II. It appears Lucent II counsel have not, and do not purport to have, conducted any investigation into the facts of either the Lucent I allegations or the allegations in their own complaints (other than to review Lucent's own press releases and other publicly-available documents). The Lucent II Plaintiffs, therefore, do not know how easy or difficult it will be to prove their claims, or for the Lucent I Plaintiffs to prove theirs.

As discussed, it appears the evidence required to prosecute Lucent II necessarily overlaps and is closely related to the evidence necessary to try *Lucent I*. Moreover, at this juncture, it does not appear that either group of plaintiffs has "a substantial antagonism toward the positions of other[s] in the class." *In re PHLCORP*, 1989 WL 251578, at *2. Accordingly, a Lucent II subclass does not appear necessary at this time.[13]

C. *Addition of Lead Plaintiffs and/or Lead Counsel*

Although any conflict at this stage of the litigation is theoretical, *Lucent I*, as originally filed, and *Lucent II* make different claims over varying periods of time. Therefore, it appears that additional representation may benefit the class and provide flexibility, if needed, in the future.

---

**13.** As with the decision to leave this matter consolidated, if, in the future, it becomes apparent that a subclass is necessary to protect the interests of a specific group of plaintiffs, an interested party may make a motion for the creation of a subclass. *See In re Microstrategy, Inc. Sec. Litig.*, 110 F.Supp.2d 427, 440 (E.D.Va.2000) ("To the extent a subclass or classes represented by separate counsel are required for the proper administration of this litigation and representation of the members of the class, that issue may be addressed at a later stage pursuant to pursuant to Rule 23."); *Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377, 394–96 (D.N.J.1998) (conflicts were theoretical, and "[a]ny concerns that may arise can be adequately addressed by the creation of subclasses"); *Chan*, 1996 WL 1082812, at *4 ("Of course, should the progression of this case reveal that the different class periods do significantly affect the nature of the parties' claims, the court is free to split the class into appropriate subclasses at that time.").

484

### 1. Addition of Lead Plaintiff

Pursuant to the PSLRA, a court "shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of the class members." 15 U.S.C. § 78u–4(a)(3)(B)(i). The most adequate plaintiff is presumed to be the person or group of persons who (1) has either filed the complaint or made a motion in response to a notice advising potential class members about the action, (2) has the largest financial interest in the relief sought by the class, and (3) otherwise satisfies the requirements of Rule 23. 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). This presumption may be rebutted by evidence that the person or group (1) will not fairly and adequately protect the interest of the class or (2) is subject to unique defenses that would prevent adequate representation of the class. 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II).

█ While the PSLRA provides for a single lead plaintiff, 15 U.S.C. § 78u–4(a)(3)(B)(i), see also In re Milestone Scientific Sec. Litig., 187 F.R.D. 165, 174 (D.N.J.1999), the statute also provides that the lead plaintiff may be a "group of plaintiffs" acting as co-lead plaintiffs. 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). In determining whether to appoint multiple class members as co-lead plaintiffs, the benefit of having "diverse representation" must be balanced against the possibility that the "appointment of multiple lead plaintiffs may result in weakened bargaining power of the lead plaintiffs," a result contrary to the PSLRA. In re Lucent Technologies, Inc. Sec. Litig., 194 F.R.D. 137, 154

(D.N.J.2000) (quoting In re Oxford Health Plans, Inc. Sec. Litig., 182 F.R.D. 42, 49 (S.D.N.Y.1998)); see also In re Nice Systems Sec. Litig., 188 F.R.D. 206, 220 (D.N.J.1999).

In light of such concerns, courts often appoint as co-lead plaintiffs a small number of class members who are most "capable of effectively managing the litigation and the lawyers." In re Baan Co. Sec. Litig., 186 F.R.D. 214, 216 (D.D.C.1999) (explaining that several class members may serve as co-lead plaintiffs) (citation and internal quotations omitted); In re Nice, 188 F.R.D. at 221 (appointing five class members as co-lead plaintiffs); In re Oxford, 182 F.R.D. at 46–47 (appointing three class members with the most losses as co-lead plaintiffs).

### a. Lucent II Lead Plaintiff Motions

In response to the Lucent II complaints, three motions have been filed seeking the appointment of lead plaintiffs (the "Lead Plaintiff Motions"). The Lead Plaintiff Motions were filed on behalf of (1) Robert Seward ("Seward") (the "Seward Lead Plaintiff Motion"),[14] (2) Joseph M. Tortell ("Tortell") and Rajesh Garg ("Garg") (the "Tortell/Garg Lead Plaintiff Motion"),[15] and (3) the Anchorage Police & Fire Retirement System ("Anchorage"), the Louisiana School Employees' Retirement System ("Louisiana") and the Parnassus Income Trust/Equity Income Fund ("Parnassus") (collectively, the "Institutional Plaintiffs") (the "Institutional Lead Plaintiff Motion").[16]

Seward has expressed a willingness to serve as a lead plaintiff in the Lucent II

---

**14.** In support of the Seward Lead Plaintiff Motion, Seward submitted a brief (the "Seward Moving Brief").

**15.** In support of the Tortell/Garg Lead Plaintiff Motion, Tortell and Garg submitted a brief (the "Tortell/Garg Moving Brief").

**16.** In support of the Institutional Lead Plaintiff Motion, the Institutional Plaintiffs submitted a brief (the "Institutional Plaintiffs Moving Brief").

action. *See* Certification of Seward, attached as Ex. C to the Seward Moving Brief. Seward certified that he has reviewed the complaint entitled *Murphy v. Lucent,* No. 00–6111, has not purchased shares of Lucent Stock at the direction of counsel or in order to participate in the litigation, is willing to be a representative and, if necessary, testify at deposition and trial, has not served or sought to serve as a representative party for a class in an action filed under the Federal securities laws within the last three years, and will not accept any payment for serving as a representative party. *Id.* Seward does not set forth the amount of his alleged losses.

Likewise, both Tortell and Garg have expressed their willingness to serve as lead plaintiffs in the *Lucent II* action. *See* Certifications of Tortell and Garg, attached as Ex. C to the Tortell/Garg Moving Brief. Both Tortell and Garg certified that they reviewed the complaint entitled *Meyer v. Lucent,* No. 00–6285, have not purchased shares of Lucent Stock at the direction of counsel or in order to participate in the litigation, are willing to be representatives and, if necessary, testify at deposition and trial, have not served or sought to serve as representative parties for a class in an action filed under the Federal securities laws within the last three years, and will not accept any payment for serving as a representative party. *Id.* During the period from 19 July 2000 through 20 December 2000, Tortell alleges losses of $941,582.00 and Garg alleges losses of $1,181,020.00. Tortell/Garg Moving Brief at 13.

In addition, each of the Institutional Plaintiffs has expressed its willingness to serve as a lead plaintiff in the *Lucent II* action. *See* Certifications, attached as Ex. B to the Institutional Plaintiffs Moving Brief. Each of the Institutional Plaintiffs has certified that it reviewed the com-

plaint, has not purchased shares of Lucent Stock at the direction of counsel or in order to participate in the litigation, is willing to be a representative and, if necessary, testify at deposition and trial, has not served or sought to serve as a representative party for a class in an action filed under the Federal securities laws within the last three years, and will not accept any payment for serving as a representative party. *Id.* During the period from 20 July 2000 through 21 December 2000, Louisiana alleges losses of $452,370.00, Anchorage alleges losses of $646,817.89 and Parnassus alleges losses of $2,588,120.00. Loss Charts, attached as Ex. C to the Institutional Plaintiffs Moving Brief.

b. *The Notification Requirement*

█ In the instant case, the notification requirement appears to be satisfied. The first notice in the Lucent II matter was published on 22 November 2000 (the "22 November 2000 Notice of Pendency"). The 22 November 2000 Notice of Pendency does not track all of the notice requirements set forth in *In re Lucent. See In re Lucent,* 194 F.R.D. at 147. Nevertheless, the PSLRA's objective of putting potential plaintiffs on notice so that they can seek to become lead plaintiffs appears to have been satisfied. Not only were notices published for the first time in January 2000, but a far more detailed notice was published by Milberg Weiss in the *Wall Street Journal* in June 2000. Moreover, in addition to the 22 November 2000 Notice of Pendency, additional notices have been published by counsel in the Lucent II actions.[17]

Requiring the *Lucent II* Plaintiffs to publish additional notice would only serve to further delay this matter. Moreover, as discussed, it appears that the notices already published in this matter adequately

---

**17.** The instant litigation has also received a great deal of press attention.

apprised potential plaintiffs of their right to move the court to serve as lead plaintiff or plaintiffs. Therefore, the notice in this matter will be deemed adequate.

A motion for the appointment of lead plaintiffs must be filed within sixty days of the publication of a notice of pendency. 15 U.S.C. § 78u–4(a)(3)(A)(i). There is no dispute as to the timeliness of the Lead Plaintiffs Motions made in response to the 22 November 2000 Notice of Pendency. The 22 November 2000 Notice of Pendency was published on 22 November 2000. The Lead Plaintiffs Motions were each filed within the sixty day time period. Accordingly, the Lead Plaintiffs Motions were timely filed.

### c. The Largest Financial Interest Requirement

It appears the Institutional Plaintiffs, as a group, have a larger financial interest in the instant litigation than either Seward or Tortell and Garg combined. Collectively, the Institutional Plaintiffs allege losses of approximately $3.7 million. Institutional Plaintiffs Moving Brief at 11. The Institutional Plaintiffs assert that they have the largest financial interest of any moving class member or plaintiff group. *Id.*

### d. Rule 23 Requirements

As mentioned, the PSLRA requires that the Proposed Lead Plaintiffs demonstrate they "otherwise satisf[y] the requirements of Rule 23." 15 U.S.C. § 78u–4(a)(3)(B)(iii)(I)(cc). Rule 23(a) provides:

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defense of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

■ "A wide-ranging analysis under Rule 23 is not appropriate [at this stage of the litigation] and should be left for consideration of a motion for class certification." *Fischler v. AMSouth Bancorporation,* 1997 WL 118429, at *2 (M.D.Fla. 6 Feb. 1997); *see also Local 144 Nursing Home Pension Fund v. Honeywell Int'l Inc.,* 2000 WL 33173017, at *5 (D.N.J.16 Nov. 2000). Nevertheless, a preliminary, fact-specific inquiry is necessary under Rule 23 to determine whether the presumptively most adequate plaintiff will adequately represent the interests of the class. *In re Lucent,* 194 F.R.D. at 149; *Chill,* 181 F.R.D. at 408.[18]

■ The "typicality requirement" under Rule 23(a)(3)

permits the court to assess whether the class representatives themselves present those common issues of law and fact that justify class treatment, thereby tending to assure that the absent class members will be adequately represented.

*Hoxworth v. Blinder, Robinson & Co., Inc.,* 980 F.2d 912, 923 (3d Cir.1992) (citation omitted).

■ The Proposed Lead Plaintiffs have demonstrated, at this preliminary stage,

---

18. Generally, a defendant or defendants may not object to the adequacy or typicality of the proposed lead plaintiff at this preliminary stage of the litigation. *Gluck v. CellStar Corp.,* 976 F.Supp. 542, 550 (N.D.Tex.1997) ("Defendants have no standing to oppose the appointment of Lead Plaintiff at this stage of the litigation.").

The determination, however, that some or all of the Proposed Lead Plaintiffs meet the requirements of Rule 23 does not preclude revisiting the issue at the class certification stage. The opportunity for Defendants to contest, if appropriate, class certification on these grounds is preserved.

typicality. The Proposed Lead Plaintiffs and the other members of the class purchased Lucent Stock on the open market during similar time periods. Moreover, each of the *Lucent II* complaints contained allegations and recitations of fact which were similar, if not identical. The legal claims and legal theories of the Proposed Lead Plaintiffs, therefore, are not so "markedly different" from those of other class members, so as to render them atypical. *See Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985).

The adequacy of the representation requirement, nevertheless, presents an inquiry that reaches beyond the factual allegations and legal theories of a complaint. The possibility of an individual plaintiff having interests in conflict with the absent class members must be considered. As explained, a finding that the claims of the Proposed Lead Plaintiffs are typical of those of the Proposed Class does not, standing alone, ensure the interests of the Proposed Lead Plaintiffs are sufficiently aligned with the Proposed Class. Forces independent of the common core of facts from which this matter arose may work to create an internal conflict among the class.

In order to assist in determining whether several proposed lead plaintiffs are in fact capable of performing as a group, such proposed representatives should provide the court with information pertaining to its members, its structure and how it will function. More precisely, the information should encompass, at minimum, a description of the members, an explanation of how the group was formed, whether there was a pre-existing relationship among any of the members and how the group intends to handle communications among its members and with lead counsel. *In re Lucent,* 194 F.R.D. at 151.

■ Nevertheless, both Tortell and Garg and the Institutional Plaintiffs have failed to provide such information. Tortell and Garg have not explained why they are being offered as a group, if they had a pre-existing relationship, or how they plan on handling communication among themselves and lead counsel. Likewise, the Institutional Plaintiffs do not describe how their group was formed, whether there was a pre-existing relationship among any of the members, or how they plan on handling communication among the group and lead counsel. The only inference that can be drawn from the submissions, therefore, is that each of the Proposed Lead Plaintiffs has a connection to the proposed lead counsel—this is not sufficient.

Congress "expect[ed] that the [lead] plaintiff will choose counsel rather than, as is true today, counsel choosing the plaintiff." H.R. Conf. Rep. No. 104–369, at 6 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 732–34 (the "House Conference Report"). Congress, moreover, intended the creation of the lead plaintiff provision to encourage institutional investors to seek out a more active role in securities action lawsuits. *Id.* On balance, institutional investors are better able and more willing, than either so-called figurehead plaintiffs or courts, to monitor attorney conduct in securities class actions. *In re Lucent,* 194 F.R.D. at 151; *In re Baan Co. Sec. Litig.,* 186 F.R.D. 214, 223 (D.D.C.1999).

In the pending matter, the losses alleged by the Institutional Plaintiffs appear to be greater those alleged by either Seward or Tortell and Garg.[19] Moreover, of the Institutional Plaintiffs, the losses alleged by Parnassus are greater than the losses alleged by either Anchorage or Louisiana. Indeed, individually, the alleged losses of

**19.** Garg—$1,181,020.00; Tortell— $941,582.00; Parnussus—$2,588,120.00; Anchorage—$646,817.89; and Louisiana— $452,370.00. As mentioned, Seward did not set forth the amount of his alleged losses.

Parnassus are greater than those alleged by any of the Proposed Lead Plaintiffs.

Moreover, Seward, Tortell, Garg, Anchorage and Louisiana do not appear to offer anything which Parnassus does not provide. For example, there is no evidence of superior ability to handle proposed lead counsel or otherwise manage the litigation. Appointing Parnassus as a co-lead plaintiff with the Pension Trust Fund, moreover, is consistent with the purpose of the PSLRA. *See* S.Rep. No. 104–98, at 11 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 690 ("The Committee believes that increasing the role of institutional investors in class actions will ultimately benefit the class and assist the courts.").

Finally, as discussed, the Institutional Plaintiffs have failed to demonstrate how they would cooperate efficiently or how the leadership issue would be handled so that control of counsel would be maximized despite the existence of several lead plaintiffs.

Accordingly, based upon the submissions, it appears that, of the Proposed Lead Plaintiffs, the "most capable of adequately representing the interests of the class members," along with the Pension Trust Fund, is Parnassus. 15 U.S.C. § 78u–4(a)(3)(B)(i). Parnassus, therefore, which will be approved as co-lead plaintiff.

### e. *Presumption Not Rebutted*

The presumption of adequacy has not been rebutted. In the instant action, the adequacy of Parnassus acting as a co-lead plaintiff has not been challenged. Absent such a challenge, the presumption of adequacy survives. *See Zuckerman v. Foxmeyer Health Corp.*, 1997 WL 314422, at *2 (N.D.Tx.28 March 1997).

Accordingly, the Seward Lead Plaintiff Motion and the Tortell/Garg Lead Plaintiff Motion are denied. The Institutional Lead Plaintiff Motion is granted to the extent it sought the appointment of Parnassus; Parnassus will serve as co-lead counsel with the previously appointed Pension Trust Fund. The Institutional Lead Plaintiff Motion is denied to the extent it sought the appointment of Anchorage and Louisiana.

### 2. *Addition of Lead Counsel*

■ "The legislative history of the PSLRA reveals that Congress wished to encourage the exercise of discretion in approving the selection of lead counsel." *In re Milestone*, 187 F.R.D. at 175. "In certain situations, the appointment of multiple lead counsel may better protect the interests of the plaintiff class." *Id.* at 176. This appears to be such a situation.

As discussed, although any conflict at this stage of the litigation is theoretical, *Lucent I*, as originally filed, and *Lucent II* make different claims over varying periods of time. Therefore, it appears that additional representation may benefit the class and provide flexibility, if needed, in the future.[20]

### a. *Approval of Proposed Lead Counsel*

■ The decision to approve counsel selected by the lead plaintiff is a matter within the discretion of the District Court. *In re Party City Sec. Litig.*, 189 F.R.D. 91, 114 (D.N.J.1999). Proposed lead counsel is simply that—proposed.

The legislative history of the PSLRA reveals that Congress wished to encourage the exercise of discretion in approving the selection of lead counsel.

**20.** Parnassus has designated the firms of Bernstein Litowitz Berger & Grossmann LLP and Cohen, Milstein, Hausfeld & Toll, P.L.L.C. as proposed lead counsel.

[Congress] does not intend to disturb the court's discretion under existing law to approve or disapprove the lead plaintiff's choice of counsel when necessary to protect the interests of the plaintiff class.

House Conference Report at 685. The nature and extent of such inquiry may vary from case to case. *See In re Lucent,* 194 F.R.D. at 155; *In re Nice Systems,* 188 F.R.D. at 222.

 The judgment of a lead plaintiff is not dispositive in the appointment of lead counsel. Approval of lead counsel necessarily requires an independent evaluation of, among other considerations, the effectiveness of proposed class counsel to ensure the protection of the class. *In re Lucent,* 194 F.R.D. at 155. The selection of counsel by lead plaintiff must be the product of deliberate and in depth evaluation, as well as of independent, arms length negotiations. *Id.*

In the instant matter, Parnassus has provided no evidence or indication of the proposed fee arrangement, its terms, or discussions or proposals leading up to it. It has provided no indication as to how the selection of the proposed lead counsel was arrived at nor what considerations went into the decision. Significantly, there is no indication of whether other counsel were interviewed or even considered.

 A District Court "is charged with ensuring that the class receives quality representation at a fair price and cannot, therefore, simply defer to lead plaintiff's choice of counsel." *Wenderhold v. Cylink Corp.,* 188 F.R.D. 577, 587 (N.D.Cal.1999); *see also In re Lucent,* 194 F.R.D. at 156 ("The lead plaintiff owes a fiduciary duty to obtain the highest quality representation at the lowest price.") (citation omitted). Mindful of this fact, it was determined in *Lucent I* that a sealed bid auction was necessary to protect the interest of the proposed class. *See In re Lucent,* 194

F.R.D. at 155–57. Because the same concerns are present with regard to *Lucent II,* co-lead counsel will also be selected by way of sealed bid auction.

b. *Bidding Process and Considerations*

 " '[A] thorough review of fee applications is required in all class action settlements.' " *In re Cendant,* 243 F.3d 722, 730 (3d Cir.2001) (quoting *In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.,* 55 F.3d 768, 819 (3d Cir.1995)). Although "the results of a bidding process may be of use to a[D]istrict [C]ourt in awarding fees at the end of the case, it cannot supplant post settlement [or post-judgment] analysis to determine a reasonable fee." *In re Cendant,* 243 F.3d at 735 n. 18. A District Court, therefore, is not bound by the bidding process. *See id.* at 731 (holding that any fee award "invites, indeed requires, judicial examination").

In *In re Cendant,* the District Court employed a sealed bid auction to select lead counsel. *Id.* at 731–32. Following a settlement, lead counsel for a class of investors applied for attorneys' fees. *Id.* at 725–26. The District Court granted a 5.7% attorneys's fee award, resulting in a fee of $19,329,463. *Id.* at 726–27. The Circuit, nevertheless, vacated the fee award after finding that the District Court's fee opinion was "too cursory." *Id.* at 733 (citing *Gunter v. Ridgewood Energy Corp.,* 223 F.3d 190, 196 (3d Cir.2000)).

According to the Circuit, "it is incumbent upon a[D]istrict [C]ourt to make its reasoning and application of the fee-awards jurisprudence clear." *In re Cendant,* 243 F.3d at 733. A fee-award opinion that is "terse, vague or conclusory" will be vacated. *Id.* (citing *Gunter,* 223 F.3d at 195). Therefore, a District Court is required to "apply the relevant legal precepts to a fee application." *Id.*

■ According to the *Cendant* court, certain factors must be addressed when considering fee awards under the percentage-of-recovery method[21] in common-fund[22] class actions. *In re Cendant,* 243 F.3d at 733. Such factors include:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members for the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Id.* (quoting *Gunter,* 223 F.3d at 195 n. 1). Although the Circuit in *In re Cendant* was speaking in terms of a fee application, several of the above-mentioned factors are relevant to the bidding process—for example, the presence or absence of substantial objections to the appointment of lead counsel, the skill of proposed lead counsel, the complexity of the case and the risks involved.

As mentioned, following a sealed bid auction, the Milberg Weiss firm was selected to serve as lead counsel. The bids in *Lucent I* were submitted under seal in order to prevent possible collusion and to maintain the confidentiality of attorney work product, to the extent it was revealed in the bidding process. The fee proposals of both the successful and unsuccessful firms, however, are not sealed.

■ A schedule which allows for a rising fee as the litigation continues, but a declining fee as the total class recovery increases within each stage of the litigation, results in maximum potential recovery for both the class members as well as the attorneys. *Id.* at 13; *see also In re Cendant,* 243 F.3d at 736–37.[23] Additionally, this format creates a disincentive for the lead counsel to "sell out" the class because at no point should its effort hypothetically outweigh its potential recovery. *In re Lucent,* letter op., at 13.

### c. Bidding for Co–Lead Counsel Position

Any law firm, including those presently unconnected with this litigation, seeking to be designated co-lead counsel for the proposed class in this action may submit a proposal for such representation to the Office of the Clerk, United States District Court, District of New Jersey on or before 4:00 o'clock p.m., 18 May 2001. The bid shall be filed *ex parte* under seal. Joint proposals are not to be submitted and will not be considered. Each proposal to be

---

**21.** "The percentage-of-recovery method is generally favored in cases involving a common fund, and is designed to award fees from the fund 'in a manner that rewards counsel for success and penalizes it for failure.' " *In re Cendant,* 243 F.3d at 731 (quoting *In re Prudential Insurance Co. Sales Practices Litig.,* 148 F.3d 283, 333 (3d Cir.1998)).

**22.** "[T]he common-fund doctrine ... allows a person who maintains a lawsuit that results in the creation, preservation, or increase of a fund in which others have a common interest, to be reimbursed from that fund for litigation expenses incurred." *In re Cendant,* 243 F.3d at 732 n. 12 (citation omitted).

**23.** In *In re Cendant,* the Circuit stated that "[t]he negotiated fee, and the procedure for arriving at it, should be left to the court's discretion. In most instances, it will involve a sliding scale dependant upon the ultimate recovery, the expectation being that, absent unusual circumstances, the percentage will decrease as the size of the fund increases." 243 F.3d at 736 (citation omitted). "The basis for this inverse relationship is the belief that in many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel." *Id.* (citations and internal quotations omitted).

submitted must identify each defendant from which or whom discovery is sought and further state:

1. The experience of the firm in securities class action litigation together with the background and experience of those particular lawyers in the firm who will be assigned to represent the class;

2. The qualifications of the firm to perform all work required for representation, including whether the firm will post a completion bond, or other type of security, for the rendering of services to the proposed class, together with a description of the terms of such bond or security;

3. A description of the malpractice insurance coverage for the firm and each of the lawyers to be assigned to representation;

4. A demonstration that the firm has thoroughly evaluated the case and a specification of the range, and probability of, recovery;

5. A statement of the dollar amount, as well as percentage, of any recovery the firm will charge in the event of a recovery as fees and costs for all work performed, such a statement is to be provided for the four contingencies as follows:

a. for pleading through motions to dismiss;

b. following the completion of the motion to dismiss through adjudication of motions for summary judgment;

c. following completions of the motions for summary judgement through verdict at trial;

d. following verdict at trial through appellate determination.

Such bid should indicate *for each of the four contingencies* on both a dollar amount and percentage basis of the net recovery to the class after fees and costs in at least the following recovery situations:

| Dollar Amount of Total Class Recovery | Dollar Amount of Total Class Recovery Net of Attorney Fees and Expenses | Percentage of Total Class Recovery Net of Attorney Fees and Expenses | Dollar Amount of Attorney Fees and Expenses for Total Class Recovery | Percentage of Attorney Fees and Expenses from Total Class Recovery |
|---|---|---|---|---|
| the first $500,000 | $ | % | $ | % |
| $ 500,001–$ 1,000,000 | $ | % | $ | % |
| $ 1,000,001–$ 5,000,000 | $ | % | $ | % |
| $ 5,000,001–$10,000,000 | $ | % | $ | % |
| $10,000,001–$15,000,000 | $ | % | $ | % |
| $15,000,001–$20,000,000 | $ | % | $ | % |
| $20,000,001–$25,000,000 | $ | % | $ | % |
| more than $25,000,000 | $ | % | $ | % |

As discussed, the proposed bids are to be submitted under seal so as to mitigate against the possibility of collusion and maintain the confidentiality of attorney work product to the extent such is revealed in a bid. As was the case with the previous sealed bid auction, the fee proposals and data of the successful and unsuccessful firms will not be sealed.

D. *Notice*

As mentioned, taken together, the notices already published in this matter satisfy the PSLRA's objective of putting potential plaintiffs on notice so that they can seek to become lead plaintiffs. Not only were notices published for the first time in January 2000, but a far more detailed notice was published in the *Wall Street Journal* in June 2000. In addition, other no-

tices have been published by counsel in the *Lucent II* actions.

As discussed, moreover, in response to the 22 November 2000 Notice of Pendency, the three Lead Plaintiffs Motions were filed. The Lead Plaintiffs Motions were considered above and Parnassus was selected as a co-lead plaintiff. Therefore, it appears the PSLRA's objective of putting potential plaintiffs on notice has been met. No additional notice is necessary.

*Conclusion*

For the foregoing reasons, the Motion to Vacate is denied. All related complaints filed against Lucent which were not incorporated into the 26 December Consolidation Order will be consolidated with the instant action. In addition, Parnassus, along with the Pension Trust Fund, are appointed as co-lead plaintiffs. A sealed bid auction will take place to select one additional lead counsel to serve along with Milberg Weiss. An order accompanies this opinion.

### ORDER

This matter having come before the court by way of a motion to vacate (the "Motion to Vacate") an order of consolidation, entered on 26 December 2000, and motions seeking the appointment of lead plaintiff (the "Lead Plaintiff Motions") and lead counsel (the "Lead Counsel Motions") filed on behalf of Robert Seward (the "Seward Lead Plaintiff Motion"), Joseph M. Tortell and Rajesh Garg (the "Tortell/Garg Lead Plaintiff Motion"), and the Anchorage Police & Fire Retirement System ("Anchorage"), the Louisiana School Employees' Retirement System ("Louisiana") and the Parnassus Income Trust/Equity Income Fund ("Parnassus") (the "Institutional Lead Plaintiff Motion"); and the court having considered the submissions of the parties; and for the reasons set forth in a Letter–Opinion filed on this date; and for good cause shown,

IT IS, on this 17th day of April 2001,

ORDERED, that the Motion to Vacate be and hereby is denied, and it is further

ORDERED, that the following cases will be consolidated with the instant action: (1) *Murphy v. Lucent*, No 00–6111; (2) *Abowitz v. Lucent*, No. 00–6123; (3) *Sakal v. Lucent*, No. 00–6282; (4) *Meyer v. Lucent*, No. 00–6285; (5) *Harris v. Lucent*, No. 00–6295; (6) *Raphael v. Lucent*, No. 01–255; (7) *Parnassus Fund v. Lucent*, No. 01–304; (8) *Feder v. Lucent*, No. 01–344; (9) *Wizbicki v. Lucent*, No. 01–477; (10) *Davis v. Lucent*, No. 01–796; and (11) *Riddle v. Lucent*, No. 01–952, and it is further

ORDERED, that the Seward Lead Plaintiff Motion be and hereby is denied, and it is further

ORDERED, that the Tortell/Garg Lead Plaintiff Motion be and hereby is denied, and it is further

ORDERED, that the Institutional Lead Plaintiff Motion be and hereby is granted in part and denied in part, and it is further

ORDERED, that the Institutional Lead Plaintiff Motion is granted to the extent it sought the appointment of Parnassus; Parnassus will serve as co-lead counsel with the previously appointed Employer–Teamsters Locals 175 & 505 Pension Trust Fund, and it is further

ORDERED, that the Institutional Lead Plaintiff Motion is denied to the extent it sought the appointment of Anchorage and Louisiana, and it is further

ORDERED, that the Lead Counsel Motions be and hereby are denied; instead, a sealed-bid auction will occur, and it is further

ORDERED, that any law firm, including those presently unconnected with this litigation, seeking to be designated co-class counsel, to serve along with the previously appointed law firm of Milberg Weiss Ber-

shad Hynes & Lerach LLP, may submit a proposal for such representation to the Office of the Clerk, United States District Court, District of New Jersey on or before 4:00 o'clock p.m., 18 May 2000. The bid shall be filed *ex parte* under seal. Joint proposals are not to be submitted and will not be considered. Each proposal submitted should conform to the opinion issued with this order.